UNITED STATES of America,
Plaintiff–Appellee,

v.

Christopher Barry GREER, Daniel Alvis Wood, Sean Christian Tarrant, Michael Lewis Lawrence, and Jon Lance Jordan, Defendants–Appellants.

No. 90–1348.

United States Court of Appeals,
Fifth Circuit.

Aug. 13, 1991.

Jeb Loveless, Dallas, Tex. (court appointed), for Tarrant.

James M. Murphy, Dallas, Tex. (court appointed), for Greer.

J. Craig Jett, Dallas, Tex. (court appointed), for Wood.

R. Kristin Weaver, Dallas, Tex., for Jordan.

Blake Withrow, Dallas, Tex. (court appointed), for Lawrence.

Lisa J. Stark, Dept. of Justice, Washington, D.C. and Marvin Collins, U.S. Atty., Dallas, Tex., for the U.S.

Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A number of members of a white "skinhead" group were found guilty by a jury of various combinations of three offenses: (1) conspiracy to injure, oppress, threaten, and intimidate black and Hispanic citizens in the free exercise of their constitutional rights under 42 U.S.C. § 2000a to use a public park, in violation of 18 U.S.C. § 241; (2) conspiracy to deprive Jewish citizens of their rights under 42 U.S.C. § 1982 to hold property, in violation of 18 U.S.C. § 241; and (3) using a firearm during the commission of this second offense in violation of 18 U.S.C. § 924(c)(1) and (3). They raise numerous issues on appeal. Finding no reversible error, we affirm.

## I.

### A.

The Confederate Hammerskins (Hammerskins) were based in Garland, Texas. During the summer of 1988, Sean Christian Tarrant, the "leader" and "founder" of the group, resided, along with defendant Christopher Barry Greer and other Hammerskins, at the group's headquarters on Nash Street in Garland. The group advocated white supremacy, a forced separation of the races, and anti-Semitism. After defendants Tarrant, Greer, and Jon Lance Jordan attended an "Aryanfest" in June 1988, during which various speakers encouraged skinhead groups to become the backbone and foot soldiers of the white supremacist movement, the group became more determined to use violence to achieve its philosophical objectives.

By the beginning of the summer of 1988, the size of the Hammerskins had grown

considerably,[1] and by that time defendants Tarrant, Greer, Jordan, and Daniel Alvis Wood were members.[2] Each Friday evening during June, July, and August, members of the group, including Tarrant, Greer, Jordan, and Wood, met at the Nash Street house to discuss their philosophy and plan activities.

### 1.

Count one centers upon the conspiracy to deprive blacks and Hispanics of the services, facilities, privileges, advantages, and accommodations of Robert E. Lee Park in Dallas. During one of the Hammerskins' meetings in July, Greer announced that he had heard that the NAACP was trying to change the name of the park because it represented vestiges of the old Confederacy. At that time, many members of the Hammerskins were outraged with the proposal and expressed their feeling that the park should be used exclusively by whites.

Based upon those discussions, the Hammerskins, including all five defendants, agreed to "patrol" the park in order to exclude minorities.[3] On more than fifteen occasions in July and August, a group of Hammerskins[4] went to the park after dark, "patrolled" in small groups, and chased, beat, and assaulted any nonwhites they found.[5] As a result of these attacks, a number of victims testified that they were now afraid to use the public park.

1. Neither the government nor the defendants provide information on the actual size of the group's membership.

2. Defendant Michael Lewis Lawrence had not yet joined the group when the initial incidents in the park occurred. Even though he did not arrive in Dallas (from his home in Chicago) until August 9, 1988, the government demonstrated that he was actively involved in planning and participating in the events described in the two counts.

3. Here, the term "minorities" means only blacks and Hispanics.

4. The government claims that the size of this group ranged between 10 and 25.

5. Most of the incidents, the defendants claim, were initiated and carried out by non-defendant

### 2.

Count two alleged a conspiracy to interfere with the rights of Jewish people to hold property. Count three alleged the use of a firearm in committing a crime of violence (referring to count two).

### a.

On August 18, 1988, Buchanan, who was a Hammerskin who later became a government witness, and Wood, Jordan, and Tarrant decided to go to the Temple Shalom in Dallas to "case it out." Wood apparently favored the idea because he disliked Jews and wanted to find out how the ventilation system worked so that he could fill it with "some kind of poisonous gas." While at the temple, Tarrant climbed a tree to get onto the roof, and Jordan and Wood damaged the temple's air conditioning wires and freon gas lines. Jordan and Wood also punctured some tires on a school bus van that was parked outside the temple. Approximately two weeks later, Buchanan and defendants Tarrant and Wood returned to the temple late at night. On this occasion, they painted swastikas, anti-Semitic slogans, and graffiti on the walls of the temple with spray paint.

Then, on or about October 8, 1988, the Hammerskins vandalized the temple and the Jewish Community Center. They spray-painted the walls with anti-Semitic graffiti, placed adhesive stickers with

Gordon Buchanan. They also mention that non-defendant Hammerskins such as Troy Mark Holmes, Chris Schutza, Michael Edward Cannon, Kevin Cardosi, Hoover (his first name was not provided), and a skinhead named "David" committed several acts of either chasing or attacking minorities in the park.

The defendants do, however, admit that some of them took part in chasing and striking minorities in the park. The defendants mention that Tarrant chased a black man out of the park on one occasion, slapped a young white woman who was with an Hispanic man on another, kicked a black man another time, and then twice threw beer cans at black men. They also concede that Greer chased a black man on one occasion, threw beer at a black man on another, and "asked some Hispanics to leave the park to avoid a confrontation" another time. Moreover, the defendants mention the fact that Lawrence beat a man with a baseball bat in the park.

graffiti on the windows, and shot out the glass on the windows and doors of the temple with a .25 caliber pistol. Inside, bullets were lodged in walls across from the main entrance to the building and on a second floor landing outside of the classrooms. Anti–Semitic graffiti was further painted in the foyer inside the temple. At the community center, the vandals spray-painted anti-Semitic graffiti on the walls, shot out windows with the same gun, and broke windows and doors with baseball bats. Such physical damage to the temple and the community center had a great effect upon the mental well-being of its membership.[6]

The government claims that four of the five defendants were involved in the temple and community center vandalism and that Wood, Jordan, and Lawrence were involved in the use of the gun in committing this crime of violence. The evidence shows that fingerprints taken by the FBI at the temple belonged to Wood and Jordan, and bullet fragments collected by a ballistics expert matched the gun later recovered by police.

Also, a number of Hammerskins who later became government witnesses testified that Wood, Lawrence, and Jordan bragged about committing the crimes and that Wood gave the gun used in the incident to Jordan's brother to sell. Evidence was further presented to demonstrate that Wood confessed his role in the affair to an FBI agent and that Lawrence told his girlfriend that he was involved in the vandalism. No evidence, however, was presented linking Greer to these incidents.

#### b.

Nevertheless, Greer was mentioned as a participant in the Hammerskins' planned vandalization of Jewish businesses in both Dallas and Euless, Texas, on November 9, 1988. The government maintains that early that night, various Hammerskins, including Schutza, Jackson, Thornton, Jordan, Greer, Lawrence, and Wood were at the Nash Street house discussing the fact that it was the fiftieth anniversary of Kristallnacht.[7] The group decided that they should vandalize Jewish buildings to commemorate the event. After considering a number of possible targets,[8] they decided to split up into two groups of five, with Jordan and Wood going in Schutza's pickup to vandalize local Jewish businesses, and with the other three Hammerskins, including Lawrence, driving in a car to Euless to vandalize other Jewish businesses.

Prior to the departure of both groups, Greer decided to not participate personally, and instead went to bed. Before leaving, though, he handed one of the Hammerskins some ball bearings and stated, "[T]his is going to smash windows. They are good for slingshots also." Defendants Jordan and Wood got baseball bats and put them into the pickup truck alongside concrete blocks, spray paint, a steel rod, and a Nazi flag belonging to Jordan. As they left, Lawrence remarked, "We will go to Euless and we will see on the news tomorrow who does the most damage."

The two vehicles left the house together. The passengers in the car going to Euless noticed that they were being followed by the police and therefore decided to abandon their plan. Schutza's pickup, in which Wood and Jordan were passengers, was stopped by the police and searched. Besides finding the articles previously mentioned, the police also found ball bearings in Schutza's jacket pocket. Wood later confessed to the FBI his participation in

---

**6.** Daniel Krause, the chairman of the temple's building committee, testified that the defacement caused many members to consider leaving the temple and resulted in an increase in security. Rabbi Jacob Parr, the spiritual leader of the temple, testified that the members' children were frightened and upset over the attack and afraid to be in the building.

**7.** On this night, November 9, 1938, the Nazis vandalized Jewish businesses throughout Germany by, among other things, breaking windows.

**8.** They also discussed vandalizing a clubhouse at a Jewish country club by smashing its windows with concrete blocks, bats, and ball bearings, and spray-painting the walls. In addition, they considered vandalizing synagogues, but decided against it since "security would be beefed up" because of the earlier incidents.

this plan and the identity of its intended targets.

### B.

In the district court, a jury convicted Tarrant, Greer, and Lawrence on counts one and two, and Jordan and Wood on counts one, two, and three. It acquitted Lawrence on count three.

Jordan was sentenced to 41 months' imprisonment on each of count one and count two, with such sentences to run concurrently. He also was sentenced to 60 months on count three, to run consecutively to the sentences on the first two counts. Greer was sentenced to 78 months on counts one and two, with such sentences to run concurrently. Lawrence was sentenced to 57 months on counts one and two, with such sentences to run concurrently. Tarrant was sentenced to 108 months on counts one and two, with such sentences to run concurrently. And Wood was sentenced to 54 months on counts one and two, with such sentences to run concurrently. He also was sentenced to 60 months on count three, with such sentence to run consecutively to the sentences on counts one and two.

### II.

The defendants contend that they were denied the right to a fair and impartial jury. They maintain that the district court erred in (1) not excluding all black, Hispanic, and Jewish citizens for cause from the panel of prospective jurors because they were intended victims of the alleged offenses; (2) failing to examine potential jurors about racial and ethnic bias; and (3) refusing to require prospective Jewish jurors to identify themselves as such. We disagree with each of these contentions and hold that the defendants were not denied a fair and impartial jury.

■ First, the district court correctly decided not to exclude all black, Hispanic, and Jewish citizens from the panel of prospective jurors. Absent a showing of individual bias, a court does not abuse its discretion when it refuses to exclude for cause an otherwise qualified class of jurors. *See*

*Smith v. Phillips*, 455 U.S. 209, 215–17, 102 S.Ct. 940, 945–46, 71 L.Ed.2d 78 (1982). Indeed, in a factually similar case, the Fourth Circuit upheld a district court's refusal to strike for cause all prospective black jurors when the defendant was an alleged white supremacist. *Person v. Miller*, 854 F.2d 656, 665 (4th Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989). Instead, the court allowed each individual juror to be questioned for bias. *Id.*

Moreover, contrary to the defendants' assertions, not all black, Hispanic, and Jewish citizens were actual victims of the alleged conspiracies. The conspiracy mentioned in count one was limited to events that happened in Robert E. Lee Park during the summer of 1988. Indeed, the only members of this group were those black and Hispanic citizens who were denied entry to the park at that time. And in count two, the only victims of the conspiracy were the actual victims who were in fact denied the use of their property as a result of defendants' actions. Thus, such victims would include only the Jewish citizens who suffered losses resulting from the vandalism at the temple and the community center and those Jewish business owners in Dallas and Euless who were targeted in the Kristallnacht incident.

■ Second, the court did not err in refusing the defendants' request to question the jurors, during voir dire, as to their racial and ethnic biases. The district court has broad discretion in determining how best to conduct voir dire and in deciding whether to excuse a juror. *Rosales–Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981); Fed. R.Crim.P. 24(a).

■ The test for determining whether a court has adequately questioned prospective jurors regarding bias is whether "the means employed to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *United States v. Saimiento–Rozo*, 676 F.2d 146, 148 (5th Cir.1982). A court abuses its discretion when the scope of voir dire is inadequate to discover bias and it de-

prives the defendant of an opportunity to make reasonable use of peremptory challenges. *See United States v. Brown,* 799 F.2d 134, 136 (4th Cir.1986).

The court in this instance adequately inquired into the jurors' possible racial, ethnic, and religious biases. As the government points out, the court's extensive voir dire, along with its juror questionnaire, satisfies the *Saimiento–Rozo* standard. Indeed, such detailed questioning should have brought up any biases that the jurors might have had. Further questions directed at such bias would have been only cumulative.

Third, the court was correct in not requiring Jewish venire-members to identify themselves. Although defendants contend that, without such information, they were denied the opportunity to use their peremptory challenges effectively, we conclude that there is no requirement that prospective Jewish jurors be made to identify themselves.

■ As discussed above, the voir dire and jury questionnaire provided defendants with the opportunity to make reasonable use of their peremptory challenges. Nor was the identification constitutionally mandated. This is so because "[t]o be constitutionally compelled ..., it is not enough that ... [particular] questions might be helpful [in assessing juror bias or in exercising peremptory challenges]. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia,* —— U.S. ——, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991) (state habeas corpus case) (citing *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)). Where, as here, the court has inquired adequately into the jurors' possible biases, and in a manner reasonably calculated to identify any who were actual or intended victims of the alleged crime, the failure to require that the prospective jurors of a particular religion identify themselves does not render the trial fundamentally unfair.

In addition, the implications, were we to *require* such a question, are troubling. Either the defense attorney or the court would ask the question (verbally or on the juror questionnaire). Either option presents serious difficulties. Permitting the attorney to ask the question might oblige the court to relinquish control of the voir dire, something we are loath to demand in light of the court's traditionally broad discretion in this area.

But having the judge determine which jurors are Jewish requires questions disturbingly reminiscent of those asked by the very people the Hammerskins sought to celebrate with their planned re-creation of Kristallnacht. The result could be to allow persons on trial for violent acts of anti-Semitism to conscript the presiding judge into a campaign to ferret out Jewish jurors merely because they are Jewish. While such questions conceivably would be appropriate under circumstances we do not consider here, the point is that the matter should remain within the district court's discretion, which was exercised properly here.

What is more, even if the defendants had learned which prospective jurors were Jewish, they constitutionally could not have based their peremptory challenges upon this information, for the Supreme Court has sought to eliminate racial and ethnic discrimination in the process of jury selection. *See, e.g., Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Hernandez v. New York,* —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Powers v. Ohio,* —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Batson v. Kentucky,* 476 U.S. 79, 87, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986). Indeed, in *Batson* the Court held that a prosecutor violates the equal protection clause of the fourteenth amendment when he exercises peremptory challenges solely on the basis of race. In reaching that decision, the Court explained that the "[s]election procedures that purposefully exclude ... persons [on the basis of race] from juries undermine public confidence in the fairness of our system of justice." *Id.*

In *Edmonson,* the Court recently extended the *Batson* ruling to apply to the exercise of peremptory challenges by a party in

a civil case, holding that "if a litigant believes that the prospective juror harbors ... biases or instincts, the issue can be explored in a rational way that consists with respect for the dignity of persons, without the use of classifications based on ancestry or skin color." 111 S.Ct. at 2088. This reading of *Batson*'s limitations on race, religion, and national-origin-based peremptory challenges, and its requirements that parties wishing to utilize such challenges must provide race-neutral explanations for their decisions, apply logically to the defendants in this case.[9]

Very recently the Supreme Court, in *Mu'Min*, 111 S.Ct. at 1904, has reiterated that a trial court "retains great latitude in deciding what questions should be asked on *voir dire*." Specifically as it applies to the instant case, the Court observed the following:

> *Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. In [*Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), and *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973),] we held that the subject of potential racial bias must be 'covered' by the questioning of the trial court in the course of its examination of potential jurors, but we were careful not to specify the particulars by which this could be done. We did not, for instance, require questioning of individual jurors about facts or experiences that might have led to racial bias.

*Id.* at 1908.

■ The defendants also are wrong in contending that the court should have asked the Jewish jurors to identify themselves so as to determine whether they are within the class of victims described in this case. As previously mentioned, the class of Jewish victims discussed in count two is not very large; it is limited to the users of the Temple Shalom and the community center in Dallas and to Jewish businesspersons who were targeted by the Hammerskins in that city and Euless. Indeed, the race-neutral questions proposed by the court and the parties on voir dire and on the questionnaires should have elicited sufficient responses for the defendants to determine whether any of the jurors was a victim of these incidents. For example, information solicited from the jurors on voir dire included their occupations, membership in fraternal, social, professional, and public service organizations, and the holding of any offices in church, temple, or religious organizations.

Furthermore, if the defendants were truly interested in finding out whether the jurors were victims of the incidents, they could have utilized post-trial procedures. They made no use of such procedures and present no evidence suggesting that any of the jurors were victims of the incidents or even were Jewish. Instead, they merely assume that there were Jewish jurors on the panel that convicted them. Nevertheless, without evidence of individual juror bias, members of all racial, religious, and ethnic groups have a right to serve on a jury that must decide upon the guilt or innocence of those charged with criminal acts of racial violence.

### III.

The defendants claim that their convictions as to counts one and two should be reversed because those counts charge them with participating in two separate conspiracies, while the evidence establishes the ex-

---

9. *See United States v. De Gross*, 913 F.2d 1417, 1423–24 (9th Cir.1990) (*Batson* applies to criminal defendant's peremptory challenges), *reh'g en banc granted*, 930 F.2d 695 (9th Cir.1991); *Edmonson*, 111 S.Ct. at 2095 (Scalia, J., dissenting) (*Edmonson* "logically must apply to criminal prosecutions"); *United States v. Clark*, 737 F.2d 679, 682 (7th Cir.1984) (pre-*Batson* case) (if defendant is allowed to object to prosecutor's race-based peremptories, then prosecutor must be allowed to object to defendant's, because defendant's racial discrimination is wrong if prosecutor's is). Whether Jewish jurors are viewed as members of a "race," *see Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987), or a religion, a defendant's exercise of peremptory challenges against them is subject to *Batson*'s strictures. Cf. *United States v. Biaggi*, 705 F.Supp. 867 (S.D. N.Y.1988) (applying *Batson* to peremptory challenges directed at Italian- and Hispanic-surnamed jurors).

istence of only one conspiracy. We disagree.

In order for a defendant to have his conviction reversed on the basis of a variance between his indictment and the evidence at trial, two findings must be made by the court: (1) that the evidence at trial actually proved one overall conspiracy and (2) that the variance affected the substantial rights of the defendant.[10] *Berger v. United States,* 295 U.S. 78, 82–83, 55 S.Ct. 629, 630–31, 79 L.Ed. 1314 (1935); *United States v. DeVarona,* 872 F.2d 114, 118 (5th Cir.1989) (citations omitted). The inquiry as to whether defendants participated in a single conspiracy or multiple conspiracies should focus upon five factors: (1) the statutory offense charged in the indictment; (2) the extent to which the overt acts charged, or any other description of the offense, indicates whether the conspiracies have a common goal, are similar in nature, or involve a common scope of activity; (3) the extent to which the events alleged as part of the conspiracies occurred at different locations; (4) the time frames during which the alleged conspiracies occurred; and (5) the extent to which the same persons are involved in the conspiracies. *See, e.g., United States v. Goff,* 847 F.2d 149, 166 (5th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988); *United States v. Levy,* 803 F.2d 1390, 1394 (5th Cir.1986).[11]

On the basis of these five factors, the evidence produced at trial demonstrates that at least two distinct conspiracies existed here. The government correctly asserts that a co-conspirator may participate in two separate conspiracies, despite the fact that the conspiracies violate the same statute. *See Goff,* 847 F.2d at 172. Although both counts charge defendants with violating 18 U.S.C. § 241, those counts are as different from one another as are the underlying statutes that guarantee the rights defendants are alleged to have denied.

In count one, defendants are charged with denying black and Hispanic citizens the use of a public park, in violation of 42 U.S.C. § 2000a; and in count two, they are charged with conspiring to deny Jewish citizens the right to hold property, in violation of 42 U.S.C. § 1982. Thus, they denied two different classes of citizens two different rights, in violation of two different statutes.

The government also was able to demonstrate that the nature and scope of the overt acts charged in the two conspiracy counts "indicate the existence of two conspiracies." *Levy,* 803 F.2d at 1395. Indeed, there is no overlap between the overt acts charged in the two counts, the nature of the overt acts charged in each count is different, and the goal of each of the alleged conspiracies is entirely different. The nature and goal of the first count is to deny black and Hispanic citizens access to a public park, and the nature and goal of the second count is to deprive Jewish citizens of their right to hold property.[12]

The government further demonstrates that the specific locations of the two conspiracies differ. Although all of the acts occurred in Dallas, those described in count

---

**10.** Indeed, even if, *arguendo,* the evidence established the existence of only one conspiracy, defendants are not entitled to a reversal of their convictions. Where the government improperly convicts a defendant on two counts of conspiracy in violation of the double jeopardy clause, it must dismiss one count, and the trial court, without regard to the original sentence, is entitled to resentence the defendant on the remaining count. *United States v. Colunga,* 786 F.2d 655, 658 (5th Cir.1986), *cert. denied,* 484 U.S. 857, 108 S.Ct. 165, 98 L.Ed.2d 120 (1987).

**11.** The government need only show by a preponderance of the evidence that separate offenses occurred, *Levy,* 803 F.2d at 1393–94, and,

in evaluating the five factors, a reviewing court must consider the evidence in the light most favorable to the government. *United States v. Elam,* 678 F.2d 1234, 1247 (5th Cir.1982).

**12.** The government correctly emphasizes that the defendants' contention that both crimes are really part of a single conspiracy "to rid the United States of non-whites, including Jews, blacks and Hispanics," is incorrect. Defendants were not prosecuted for membership in or adherence to any particular organization or political philosophy, but instead were prosecuted for separate acts directed against different groups and violating different sets of constitutional rights.

one took place in Robert E. Lee Park, while the acts in count two occurred outside the park. Accordingly, the location of the incidents likewise suggests two conspiracies. *See United States v. Thomas*, 759 F.2d 659, 667 (8th Cir.1985).

On issues four and five of the *Goff* test, the government's evidence is weaker. There is a great degree of overlap between the incidents listed in each count. The incidents in count one began in June 1988 and continued until October 1988, while those in count two began in August 1988 and continued until November 9, 1988. Nevertheless, such a time period is not determinative as to whether there is one conspiracy or multiple conspiracies. *See Goff*, 847 F.2d at 169.

Also, there is a complete overlap of the defendants who participated in these two conspiracies. While such an overlap makes it more likely that a single conspiracy existed, *see United States v. Winship*, 724 F.2d 1116, 1122 (5th Cir.1984), the government is correct in asserting that no case has held that commonalty of membership in two illegal activities necessarily precludes the existence of two conspiracies. Thus, since the government only has to prove by a preponderance of the evidence that such separate conspiracies existed, it has done so in this case by demonstrating that the incidents differed in terms of the goals, locations, and statutes involved.

## IV.

■■■ The defendants aver that the district court committed reversible error by not giving a "multiple conspiracy instruction." [13] Specifically, the defendants argue that because the evidence reveals multiple conspiracies, the jury, without such an instruction, could have convicted based upon a belief that defendants participated in separate conspiracies to commit certain of the overt acts without concluding that they all were members of the two conspiracies charged in counts one and two.

We disagree. The court's instructions to the jury were adequate to inform it to consider whether each of the defendants joined the conspiracies as described in the two counts. Also, there is no basis on which to assume that the individual overt acts mentioned here constituted separate conspiracies.

■■■ Defendants are entitled to a multiple conspiracy instruction when they specifically and timely request such an instruction and their theory of multiple conspiracies is supported by the law and has some foundation in the evidence. *United States v. Toro*, 840 F.2d 1221, 1236 (5th Cir.1988). The court may decide, as a matter of law, that the evidence fails to raise a factual question for the jury, *United States v. Metz*, 608 F.2d 147, 158 (5th Cir. 1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980), but it commits reversible error when it refuses a defendant's specific request to instruct on a multiple conspirator theory and the theory has any evidentiary support whatsoever. *United States v. Fowler*, 735 F.2d 823, 828 (5th Cir.1984). Indeed, a multiple conspiracy instruction "is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charge in the indictment." *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir.), *cert. denied*, ─── U.S. ───, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989) (citations omitted).

The instruction provided by the court was sufficient to meet this concern. Such instruction stated that "the evidence in this case *must* show beyond a reasonable doubt before you can find the existence of a

---

**13.** The defendants requested that the following instruction be included as part of the charge:

You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

conspiracy ... [t]hat two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment." (Emphasis in original.) The jury also was told that in order to convict, it had to find that each of the defendants joined the conspiracies charged in the indictment with the intent of accomplishing the conspiracy's stated purpose.

The defendants fail to satisfy the *Toro* test. They have not demonstrated that their theory of multiple conspiracies is supported by law and has some foundation in evidence. As such, it is doubtful that their proposed instruction would have had any effect upon the outcome of this case.

## V.

▮ The defendants contend that the court committed reversible error when it misstated the law while instructing the jury as to counts one and two. While they maintain that the court correctly stated the definition of the fourth element in both conspiracy counts (namely, that the conspiracy was directed at the free exercise or enjoyment of a right secured by "the Constitution or laws of the United States"), they believe that the court's explanation of the proof necessary to satisfy the element was incorrect.

Thus, the defendants argue that the court should have charged the jury that it had to find that the defendants had the "specific intent" to deprive the victims of a right or rights secured by "the Constitution or laws of the United States." Instead, they aver that the jury was instructed that the fourth element of the offense would be satisfied by showing that the defendants engaged in conduct that had the effect of violating a right or rights protected by "the Constitution or laws of the United States." [14]

▮ The standard of review for jury instructions is whether the court's charge, as a whole, is a correct statement of the law and plainly instructs the jurors as to the principles of law applicable to the fact issues confronting them. *United States v. Chen*, 913 F.2d 183, 186 (5th Cir.1990). If a charge to the jury, when considered in its entirety, correctly states the law, the incorrectness of one paragraph or one phrase alone is generally not considered to be reversible error. Indeed, a misstatement of the law by a trial judge that "dilutes the specific intent requirement" is not reversible error if the instruction as a whole suggests the appropriate standard to be applied. *United States v. Durnin*, 632 F.2d 1297, 1300 (5th Cir.1980). But if two instructions are in direct conflict and one is obviously prejudicial, there is reversible error, as the jury may have followed the erroneous instruction. *United States v. Panter*, 688 F.2d 268, 270 (5th Cir.1982).

The government is correct in its contention that the various instructions cited by the defendants do not conflict with the numerous "intent" instructions provided to the jurors. The defendants do, however, correctly point out that the instructions they cite do not include the words "specific intent." But the lack of such wording in these instructions does not mean, as the defendants imply, that the court informed the jurors that any crime committed by the defendants against blacks and Hispanics in count one, and against the property of Jewish citizens in count two, then implies that these defendants had the intent necessary to establish a conspiracy under 18 U.S.C. § 241.

Rather, the government rightly asserts that such instructions, when considered in light of the record as a whole, merely have diluted the specific intent requirement. While not expressly mentioning the words "specific intent" in its instructions, the court successfully conveyed, through its instructions, that the government only must establish that defendants agreed to engage in conduct that constitutes a denial

---

**14.** The defendants point out in their reply brief that "the jury was instructed that it was only necessary that the conspirators intended to do an act which would have the effect of interfering with such rights." This statement thus conflicts with their earlier statement that the court failed to mention the topic of intent, and especially specific intent.

of a right protected or secured by "the Constitution or laws of the United States." *Anderson v. United States,* 417 U.S. 211, 226, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974).

Indeed, in instructing the jury regarding intent, the government sufficiently described numerous ways in which the district court satisfied the "specific intent" element of counts one and two. It (1) repeatedly indicated that the alleged purpose of the respective conspiracies was to deny certain citizens a statutory right; (2) defined the elements of conspiracy exactly as is required; (3) three times used the terms "willfully" or "knowingly" when defining the elements of the offense; (4) indicated that in order to convict, the government must establish that defendants either knowingly or willfully participated in the conspiracy with the purpose of knowingly committing an overt act and accomplishing the stated purpose of the conspiracy; (5) three times instructed that the government must prove that defendants conspired with the intent to do an act that interfered with a protected right; and (6) defined the terms "willfully," "knowingly," and "specific intent," explaining that the government must prove that defendants knowingly did an act that the law forbids, purposely intending to violate the law. Thus, such instructions more than offset those mentioned by the defendants. *Cf. Yates v. Evatt,* — U.S. ——, 111 S.Ct. 1884, 1892 n. 6, 114 L.Ed.2d 432 (1991).

## VI.

The defendants maintain that the court erred in failing to grant their motion for judgment of acquittal as to counts one and two, charging violations of section 241. As to count one, defendants contend that the evidence is insufficient to establish that they (1) "intended to interfere with or violate the civil rights of any individual citizen" and (2) conspired to deprive citizens of any of the "services, facilities, privileges, advantages and accommodations" that the government witnesses described as available in Robert E. Lee Park. As to count two, defendants argue that the evidence

fails to prove that they conspired to deprive Jewish citizens of their right to hold property, as alleged. We agree with the government that the defendants have a fundamental misunderstanding of the law on this issue and that their contentions are belied by the record.

A defendant seeking to reverse his conviction on the basis of the insufficiency of the evidence bears a heavy burden. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) (citations omitted); *see United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir.) (*en banc*), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). In evaluating the sufficiency of the evidence, the reviewing court must consider the evidence and draw all reasonable inferences favorable to the government. *United States v. Briscoe,* 742 F.2d 842, 845–46 (5th Cir.1984) (citing *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469). Thus, appellate courts "must affirm the defendant's conviction as long as the jury's construction of the evidence as supporting the defendant's guilt beyond a reasonable doubt was reasonable," even where the evidence does not exclude every reasonable hypothesis of innocence. *United States v. Michelena–Orovio,* 719 F.2d 738, 743 n. 4 (5th Cir.1983) (en banc), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984).

## A.

The court properly denied the defendants' motion for judgment of acquittal on count one. As the government contends, it appears that the defendants misunderstand the nature of the statutory "race-hate" crime that is alleged in count one. Indeed, as to count one, defendants were convicted of conspiring to deprive black and Hispanic citizens of their right to use Robert E. Lee Park without discrimination on the ground of race, color, or national origin, by chasing, beating, and assaulting them in violation of section 241. While the defendants concede that "the govern-

ment has ... offered proof that there was a conspiracy to commit assault[s]," they argue that "[t]here is a total absence of any evidence that the object of any agreement ... was to interfere with or violate the civil rights of any individual citizen."

The defendants seem to misapprehend the nature of this group-based conspiracy crime. If the government could have identified positively the many victims of their assaults, it is more than likely that such defendants would have been charged with the actual crimes, instead of merely conspiracies, as is the case here. But as the government has decided to punish the defendants for their conspiracy to keep blacks and Hispanics out of a public park, in violation of 42 U.S.C. § 2000a,[15] it need only establish the existence of a conspiracy that seeks to deprive such people of this specific statutory right and an overt act that indicates the conspiracy may have been carried out. There is no doubt that in this case, such a conspiracy to keep blacks and Hispanics out of the park was developed and carried out.

■ Also, the defendants' claim, to the effect that the evidence does not establish that they conspired to deprive black and Hispanic citizens of any of the services, facilities, privileges, and accommodations that the government witnesses described are available at the park, is meritless. The evidence conclusively demonstrates that defendants conspired to deny members of these groups any and all use of the park. Accordingly, it is not necessary for the government to demonstrate that defendants conspired to interfere with any particular services there.

### B.

■ The court's decision on the defendants' motion for acquittal on count two is more problematic. As previously mentioned, the defendants claim that the evi-

dence fails to prove that they conspired to deprive Jewish *citizens* of their right to *hold* property, as alleged. Thus, they assert that the temple and the community center are non-profit corporations, which are not citizens within the clause of the Constitution declaring that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1.

Therefore, since the members of the temple and the community center actually are members of their respective non-profit corporations, they are not citizens within the meaning of section 241, *Pembina Consol. Silver Mining & Milling Co. v. Pennsylvania*, 125 U.S. 181, 8 S.Ct. 737, 31 L.Ed. 650 (1888), and are not able to hold property within the meaning of this section. Thus, the defendants argue that their motion for acquittal should have been granted, as no victims of this conspiracy have been identified.

Although the defendants' claims have some merit, the government is able to obviate these concerns by demonstrating successfully that the phrase "to hold" property under the statute can also mean "to use" property. *See City of Memphis v. Greene*, 451 U.S. 100, 120, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 421–22, 88 S.Ct. 2186, 2193–94, 20 L.Ed.2d 1189 (1968). In this way, the government is able to establish that members and non-members of the temple and community center, such as guests, could claim that the acts of defendants violated their right to use this property. *See Walker v. Pointer*, 304 F.Supp. 56, 61–62 (N.D.Tex.1969).

### VII.

Wood and Jordan claim that the court erred in refusing to suppress evidence

---

**15.** Section 2000a(a) provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, ... without [regard to] discrimination or segregation on the ground of race, color, religion, or national origin." Under this statute, public parks are places of public accommodation. *See Evans v. Seaman*, 452 F.2d 749, 751 (5th Cir.1971), *cert. denied*, 408 U.S. 924, 92 S.Ct. 2493, 33 L.Ed.2d 335 (1972); *Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 348 (5th Cir.1968) (en banc).

seized from a pickup truck in which they were passengers, on the ground that the seizure was the fruit of an unlawful stop. We disagree.

The fourth amendment's protection against unreasonable searches and seizures applies to brief investigatory stops of vehicles. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). A stop must be justified by reasonable suspicion that the person stopped is, or is about to be, engaged in some type of criminal activity. *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 678, 83 L.Ed.2d 604 (1985); *Cortez*, 449 U.S. at 417, 101 S.Ct. at 694. This reasonable suspicion standard is not as stringent as that of probable cause. *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

■ "Reasonable suspicion" has been defined as the accumulation of "those articulable, objective facts and circumstances observed by the officer, coupled with the rational inferences which can be drawn from those facts and circumstances."[16] *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). The level of objective manifestation needed here is only minimal. *See INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). Moreover, the determination of "reasonable suspicion" involves the "totality of the circumstances, including the 'collective knowledge' of all [the] officers in assessing the facts." *United States v. Shaw*, 701 F.2d 367, 377 n. 4 (5th Cir.1983) (quoting *United States v. Cimino*, 631 F.2d 57, 59 (5th Cir.1980); *United States v. Kreimes*, 649 F.2d 1185, 1189 (5th Cir. Unit B July 1981), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984)).

■ On the basis of this law and the facts presented here, the court correctly concluded that the police had a legitimate ground to stop the pickup truck in which

certain of the defendants were passengers. The members of the special task force on racial and ethnic hate crimes knew the identities and affiliations of the persons who were in the truck prior to its being stopped. It is also undisputed that the officer who stopped the truck was investigating racial and ethnic hate crimes and had focused upon the Hammerskins by conducting an ongoing surveillance of their headquarters. *See United States v. Buchannon*, 878 F.2d 1065, 1067 (8th Cir. 1989) (police justified in stopping cars departing in caravan from suspected drug house).

Moreover, the task force collectively, and the arresting officer individually, were aware of the significance of November 9, 1988, to the Hammerskins. The officers had reasonable *individualized* suspicion that these persons were preparing to engage in unlawful conduct, warranting a brief investigatory stop to verify or dispel their suspicions. *See Terry*, 392 U.S. at 30, 88 S.Ct. at 1884 (1968) (officers who had reasonable individualized suspicion that individuals were "casing" a store could detain them briefly).

■ Nor have Wood and Jordan been able to establish that they had a legitimate expectation of privacy in the truck entitling them to contest the search. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated." *Rakas v. Illinois*, 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–90, 88 S.Ct. 967, 973–74, 19 L.Ed.2d 1247 (1968); *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960)). To meet this burden, a defendant challenging the legality of a search must establish that the "disputed search and seizure has infringed an interest of ... [his] which the Fourth Amend-

---

**16.** Similarly, objective facts that are meaningless to the untrained can be combined with permissible deductions "to form a legitimate basis for suspicion of a[ ] person." *Cortez*, 449 U.S. at 419, 101 S.Ct. at 696. Also, innocent behavior, when considered under the totality of circumstances, may be sufficient to establish reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) (citing *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

ment was designed to protect." *Id.* 439 U.S. at 140, 99 S.Ct. at 429.

In *Rakas* the Court determined that passengers who asserted neither a property nor a possessory interest in the automobile that was searched, nor any interest in the seized property, had no legitimate expectation of privacy entitling them to the protection of the fourth amendment. *Id.* at 148, 99 S.Ct. at 433. This circuit has interpreted *Rakas* and has held that a passenger without a property or possessory interest in a vehicle cannot challenge its search. *See, e.g., United States v. Strmel,* 744 F.2d 1086, 1088 (5th Cir.1984); *United States v. Costner,* 646 F.2d 234, 236 (5th Cir. Unit A May 1981).

On the basis of this law, Wood and Jordan have no standing to object to the search of the car or its passengers. They were only passengers in the truck, and they never claimed a possessory or ownership interest in the vehicle or its contents. Thus, they had no legitimate expectation of privacy and cannot complain that their fourth amendment rights have been violated.[17]

## VIII.

Tarrant argues that the court erred in concluding that he lacked standing to object to items obtained from Elizabeth Sherry's bedroom pursuant to a grand jury subpoena duces tecum.[18] He maintains that his being in prison should not deprive him of any fourth amendment rights he may have had to complain of a warrantless search and seizure of the home he shared with his wife.[19] *See Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). Tarrant also contends that he kept his personal belongings at the house, paid one month's rent there before being incarcerated, had the ability to exclude others from the residence because he had a key, and planned to return to the house when he was released from prison. Thus, according to *United States v. Dotson,* 817 F.2d 1127, 1135 (5th Cir.1987), and *United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir. Unit A July 1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982), Tarrant asserts that he has maintained a legitimate expectation of privacy for the items seized in this house.

At the outset, we note that the items were obtained pursuant to a grand jury subpoena duces tecum.[20] Under Fed.R. Crim.P. 17(c), a recipient of such a subpoena is entitled to have it quashed only if compliance with it would be "unreasonable or oppressive." *See United States v. R. Enters., Inc.,* — U.S. —, 111 S.Ct. 722, 727, 112 L.Ed.2d 795 (1991). Since the subpoena here was specific, requested only a limited number of items, and related to the grand jury's investigation, Tarrant has no

---

17. In any event, the admission of the seized items was harmless, as several Hammerskins testified regarding the contents of the truck, making the items themselves merely cumulative of the testimony, which was not tainted by the alleged illegality of the stop and search because it was derived from an "independent source." *See Murray v. United States,* 487 U.S. 533, 536, 108 S.Ct. 2529, 2532, 101 L.Ed.2d 472 (1988) (exclusionary rule does not prohibit admission of evidence unlawfully discovered if the government demonstrates that the evidence was later obtained independently of the unlawful police activity source).

18. Such items included various newspaper clippings, literature, photographs, and documents. Of this information, six pieces of racist literature and a photograph of various persons at Robert E. Lee Park during late July or early August were admitted into evidence.

19. Tarrant married Sherry while in prison. While the government claims that she was only his girlfriend at the time of the search and seizure, Tarrant maintains now that they were common law man and wife. Although Tarrant cites the relevant statute for this proposition, he fails to present any facts that would substantiate this claim. Indeed, it is doubtful that his living with Sherry for one month would satisfy the Texas statute's common law marriage provisions. Also, there is no indication that Tarrant brought up the issue of common law marriage at trial. *See Wilson v. Waggener,* 837 F.2d 220, 222 (5th Cir.1988).

20. The subpoena directed Sherry to bring "[a]ll pamphlets, brochures, and newsletters, publications, news articles, scrapbooks, photographs and video cassettes which record or are related to the activities of the Confederate Hammerskins during the months June through November, 1988."

basis to claim that this was "unreasonable or oppressive."

Further, our review of the record reveals that Tarrant's claim fails under the *Haydel* factors, which are

> whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

649 F.2d at 1155. The court applied these factors [21] and found, among other things, that Tarrant had been living with other Hammerskins on Nash Street, *not* with his girlfriend, and had no interest in the items that were seized. Therefore, he maintained no legitimate expectation of privacy in his girlfriend's abode.[22]

And finally, admission of the subject evidence at most only constituted harmless error. Tarrant has admitted that such literature "did not directly bear on the facts of the instant case," and the photograph, while relevant, is cumulative, as the testimony amply establishes the presence of the defendants in the park. Even if it was illegally seized, such material could not have had a substantial effect upon the jury's decision, as the court repeatedly instructed the jury not to convict the defendants on the basis of their political beliefs.

## IX.

Defendants contend that the court erred in admitting two statements as declarations of a co-conspirator pursuant to Fed.R.Evid. 801(d)(2)(E).[23] The first statement was made to Officer Donna Lowe of the Dallas Police Department while she was investigating a racial assault in Robert E. Lee Park. At trial, Officer Lowe testified that upon approaching and asking a group of approximately twelve to fifteen white males at the park what was going on, one individual responded, "[W]e're just out here chasing niggers." While Lowe later testified that these individuals were "skinheads" and that defendants Tarrant and Jordan were among them, the officer was not able to identify which person made the statement. The second statement was made by Lawrence. Holmes, a former Hammerskin, testified that Lawrence said to him that all Jewish and black citizens should be "put on a boat and sent out to sea and blown up" and that black citizens should be sent "back to Africa."

The government maintains that both statements were properly admitted—the first as a co-conspirator's statement and the second as an admission and a statement as to state of mind, pursuant to Fed.R. Evid. 801(d)(2)(A) and 803(3), respectively. The government also asserts that any error in the admission of these statements was harmless.

Three requirements must be met in order for a co-conspirator's statement to be admissible pursuant to rule 801(d)(2)(E): "(1) there must be a conspiracy; (2) the statement must be made during the course and in furtherance of the conspiracy; and (3) the declarant and defendant must be members of the conspiracy." *United States v. Miliet*, 804 F.2d 853, 856 (5th Cir.1986) (citing *United States v. James*, 590 F.2d 575, 578 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979)). All three of these elements must be established by a preponderance of the evidence. *Bourjaily v.*

---

**21.** In so doing, the court must review the evidence in the light most favorable to the government. *United States v. Torres,* 720 F.2d 1506, 1510 (11th Cir.1983).

**22.** Apparently, the court decided that Tarrant's girlfriend possessed the items seized, primarily on the basis of her earlier testimony that she was the spokesperson for the Hammerskins and had collected memorabilia on the group for the benefit of no one but herself. She later changed her testimony and stated that a photo album that was seized had belonged to both her and Tarrant.

**23.** Rule 801(d)(2)(E) provides in pertinent part that a statement is not hearsay if it is "offered against a party and is ... a statement by a conspirator of a party during the course and in furtherance of the conspiracy."

*United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987).

▇▇▇▇ It also is necessary for a court to consider not only the nature of the statements, but also the context in which they were made. *United States v. Handy*, 668 F.2d 407, 408 (8th Cir.1982). Moreover, on appeal the court must consider the evidence in the light most favorable to the government. *United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982).

▇▇▇▇ The government fails to satisfy the *Miliet* standard for its presentation of Lowe's statements concerning the remarks made by the unidentified Hammerskin in the park. While the government can demonstrate that a conspiracy had existed at this time and that the statement was made during the course and in furtherance of the conspiracy,[24] it fails to show that the declarant and the defendants were members of the conspiracy. Since only five defendants were convicted of the conspiracy out of a possible fifteen that were present when the statement was made, there is a good possibility that the person who made the statement was not a party to the conspiracy.

Nevertheless, this error was harmless. Indeed, the government produced substantial evidence at trial dealing with the thoughts and behavior of the various Hammerskins in the park during the summer of 1988, so that the admission of this testimony had little effect upon the jury's decision to convict. Moreover, this error is not " 'so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice.' " *United States v. Adkins*, 741 F.2d 744, 748 (5th Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478

(1985) (quoting *United States v. Howton*, 688 F.2d 272, 278 (5th Cir.1982)).

▇▇▇▇ The district court did not err in admitting Lawrence's racial comments. Contrary to defendants' assertions, the government sought to have such statements admitted against Lawrence under rule 801(d)(2)(A).[25] Thus, the government need not establish the prerequisites to admitting a co-conspirator's statement under rule 801(d)(2)(E) when that statement is made by the defendant. *See United States v. Manzella*, 782 F.2d 533, 545 (5th Cir.), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). Here, it is undisputed that Lawrence made the statements in question.

### X.

Lawrence, Tarrant, Jordan, and Greer claim that the court abused its discretion when it denied their motions for severance. They argue that their joinder to Wood created a specific and compelling prejudice that deprived them of a fair trial. Since Wood had pleaded guilty in state court to vandalizing the temple and had received a maximum sentence there of ten years, the defendants believe that they were improperly linked to his crimes. Also, they maintain that they were denied effective defense, because while his redacted testimony could be offered into evidence, his conviction in state court could not. Moreover, the defendants assert that they did not have an adequate opportunity to cross-examine him about the veracity of his testimony.

▇▇▇▇ The court did not abuse its discretion in denying the severance motions. On appeal, a defendant has "an extremely difficult burden," since denial of a motion for severance will be reversed only when he demonstrates specific compelling prejudice that actually results in his having received an unfair trial. *United v. DeVeau*, 734

---

24. As the government contends, the Hammerskin's remark was either used to minimize or boast of the group's activity in the park. In either case, such a statement was made in furtherance of the conspiracy.

25. Rule 801(d)(2)(A) provides in pertinent part that a "statement is not hearsay if ... [t]he statement is offered against a party and is ... the party's own statement in either an individual or a representative capacity."

F.2d 1023, 1027 (5th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985) (quoting *United States v. Johnson,* 478 F.2d 1129, 1131 (5th Cir.1973)).

■ Indeed, such prejudice must outweigh "the public interest in the economy of judicial administration." *United States v. Basey,* 816 F.2d 980, 1004 (5th Cir.1987) (citing *United States v. Acosta,* 763 F.2d 671, 697 (5th Cir.1985)). Moreover, there is a strong policy in favor of a joint trial where the charge against the defendants may be proven by the same evidence, results from the same series of acts, *United States v. Coppola,* 788 F.2d 303, 306–07 (5th Cir.1986), and involves conspiracy charges. *Elam,* 678 F.2d at 1250 (citing *Shaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); Fed.R. Crim.P. 8).

■ While a defendant on appeal must demonstrate specific and compelling prejudice, such prejudice may arise, as alleged in this case, where "one defendant who does not testify—and consequently cannot be cross-examined—has incriminated a codefendant in statements which are offered in evidence at trial." *Basey,* 816 F.2d at 1004. Citing *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968), we held that such statements "create[ ] a substantial risk of prejudice to the nondeclarant codefendant, because the jury might—despite limiting instructions to the contrary—consider them against the nondeclarant." *Basey,* 816 F.2d at 1004. In these situations, the sixth amendment confrontation clause requires judges either to refuse to admit the co-defendant's statements or to grant a new trial. *Id.*

It is also important for the court to determine whether such out-of-court statements plainly implicate the co-defendant. "[I]f the statement does not do so, no serious *Bruton* issue is presented." *Id.* at 1005. "Even if a statement is admitted in violation of the *Bruton* principle, the error may be harmless if the statement's impact is insignificant in light of other evidence against the defendant." *Id.* (citing *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972)).

In this case, Wood's detached statement did not specifically implicate any of the individual defendants in his crimes. Rather, his testimony only attested to the fact that he was accompanied on these sprees of vandalism by other Hammerskins. Any specific linkage of the defendants to each individual crime only came through other evidence presented by the government. Even though the government may have linked Tarrant and Jordan with Wood's crimes in its opening statements, it still had to present additional evidence and testimony to convince the jury that the "other Hammerskins" whom Wood implicated in his detached statement actually were these individuals. Thus, the court did not deprive the defendants of any sixth amendment confrontation rights.

## XI.

■ The defendants argue that the court abused its discretion in refusing to allow testimony that Wood previously had been convicted of state crimes relating to the vandalism of the temple,[26] which is charged in counts two and three. We are unpersuaded by such contentions.

In accordance with Fed.R.Evid. 402, testimony must be relevant in order to be admissible. Nevertheless, even when relevant, it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R. Evid. 403. Indeed, a district court retains

---

**26.** On January 12, 1989, Wood pleaded guilty in state district court to a charge of criminal mischief arising out of his vandalizing the temple on October 8, 1988. One month after the plea, Wood agreed to cooperate fully with law enforcement authorities and to provide truthful information relating to a number of illegal acts committed by members of the Hammerskins, in exchange for a promise from the state and the United States not to prosecute him for any crime (except those involving death or serious bodily injury). After initially speaking to investigators, Wood refused to cooperate any further and subsequently was indicted on the charges that are the basis of this appeal.

"considerable latitude ... in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention ... [to be presented] in a manner least likely to confuse that body." *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974).

Wood's state court conviction is not relevant for the reasons suggested by the defendants. It is not probative as to why certain Hammerskins testified against the defendants, because testimony was presented by an FBI agent that such individuals were to be charged with lesser offenses in light of their cooperation. Indeed, the court never precluded the defendants from questioning the cooperating Hammerskin witnesses concerning their knowledge of why Wood was prosecuted or whether such knowledge, itself, influenced their testimony. Also, the fact of Wood's conviction was not probative of why the government prosecuted him: He was prosecuted in this case because he committed the underlying offenses and reneged on his agreement to cooperate.

Even if Wood's prior conviction somehow was relevant, the court did not abuse its discretion in concluding that such testimony would confuse the jury. It is more than likely that the jury, upon hearing of Wood's prior conviction, would have been confused as to why it was being asked to render a verdict against Wood in light of the fact that he already had pleaded guilty to vandalizing the temple. *See United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir.1976). Furthermore, the evidence could have hampered the government unfairly by suggesting that Wood already had been convicted and punished for his unlawful conduct.

### XII.

The defendants contend that the court violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C. § 3500, when it failed to require the government to disclose portions of the grand jury transcripts of certain government witnesses. They argue that the denial of access to this testimony prevented them from demonstrating that "the government's witnesses were really the ones committing crimes" and that defendants "were tried for failing to cooperate with the government and not because of their unique involvement in conspiracies or overt activities." Nevertheless, we agree with the government, that the court correctly decided, after an *in camera* review, that the testimony in question was not subject to *Brady* or the Jencks Act.[27]

The *Brady* doctrine requires the government to disclose evidentiary material that is favorable to the defense and material to the issue of guilt or punishment. *Brady*, 373 U.S. at 87–88, 83 S.Ct. at 1196–97; *Brogdon v. Blackburn*, 790 F.2d 1164, 1167 (5th Cir.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987). The government, however, is not obligated to disclose information that is not exculpatory. *See United States v. Killian*, 639 F.2d 206, 211 (5th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).

Moreover, a prior statement of a witness who is available to testify at trial is admissible only if it is inconsistent with his trial testimony. *United States v. Morlang*, 531 F.2d 183, 191 (4th Cir.1975). Likewise, evidence relating to the prior bad acts of government witnesses is inadmissible, as testimony regarding specific instances of misconduct of a witness, not resulting in a conviction, is not admissible to attack the witness's credibility. *See United States v. Cox*, 536 F.2d 65, 70 (5th Cir.1976); Fed.R.Evid. 608(b).

The government was not obligated to disclose the excised portions of the

---

**27.** Section 3500(c) (the Jencks Act) provides in pertinent part as follows:

If ... any portion of ... [a] statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge.

grand jury testimony here, as they did not contain exculpatory information. As the government demonstrates, the excluded portions do not contain evidence that shows that the government witnesses, rather than the defendants, committed the crimes. Rather, all but one of the additional acts of violence described in the excluded portions of the testimony involve at least one of the defendants. Thus, they are not exculpatory.

■■■ The Jencks Act requires the government, upon request, to produce any statements of its trial witnesses that relate to the subject matter of their testimony on direct examination.[28] Grand jury transcripts that relate to a transaction different from that for which a defendant was on trial are not covered by the act. *See United States v. Fanning*, 477 F.2d 45, 49 (5th Cir.), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973). Indeed, the "underlying purpose of the Jencks Act ... is solely to enable the defense to impeach a government witness by bringing ... variances [between testimony at trial and pretrial statements] to the attention of the jury during cross-examination." *United States v. Prieto*, 505 F.2d 8, 11 (5th Cir. 1974) (citations omitted).

■■■ The government also is correct in demonstrating that the excluded portions of the grand jury testimony were not subject to disclosure pursuant to the Jencks Act. Five of the grand jury transcripts to which defendants claim they are entitled are witnesses who never testified at trial. Moreover, the undisclosed portions of the grand jury transcripts of witnesses who testified at trial do not relate to their trial testimony. The only exceptions to this rule, the government maintains, are four portions of FBI Agent Becksmith's testimony and one portion in which defendant Wood, while speaking to another

Hammerskin, denied his participation in the vandalism at the temple and the community center.

The government's explanations for excising such portions of grand jury testimony are adequate. Becksmith's testimony did not relate directly to his testimony at trial. Other testimony, such as his summation of the FBI ballistics report and his general summation of the events that occurred in the park, merely is duplicative of information to which the defendants had ample access.

The government's explanations for excluding Wood's denial, however, are less sufficient. Even though it claims that such a statement would be self-serving and thus inadmissible at trial, it did relate sufficiently to his trial testimony. Nevertheless, given the overwhelming evidence against Wood placing him at the scene of this crime, the admission of such information is only harmless error, at most.

## XIII.

■■■ Wood and Jordan maintain that the court erred in failing to dismiss count three of the indictment, which charged them with violating 18 U.S.C. § 924(c) by carrying a firearm during and in relation to the commission of a crime of violence. They assert that the court should have dismissed count three because (1) the predicate crime—conspiring to deny citizens their civil rights in violation of 18 U.S.C. § 241—is not a crime of violence, and (2) they did not "use" a firearm "during and in relation" to the conspiracy to deny citizens their civil rights, as required by section 924(c). These defendants, however, appear to misread the statute.

■■■ Section 924(c)(1) prohibits the use of a firearm "during and in relation to any crime of violence." [29] The term "crime of violence" is defined in section 924(c)(3) as

---

**28.** While the Jencks Act does not require pretrial disclosure of statements, *United States v. Glassman*, 562 F.2d 954, 957 (5th Cir.1977), the court ordered the government to turn over all statements of individuals whom the government intended to call as witnesses, four days prior to trial.

**29.** Section 924(c)(1) provides in pertinent part,

Whoever, during and in relation to any crime of violence ... uses or carries a firearm, shall, in addition to punishment provided for such a crime of violence, be sentenced to imprisonment for five years....

an offense that is a felony and

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The indictment alleges that the defendants committed a crime of violence by virtue of the offense alleged in count two, a conspiracy against the rights of citizens in violation of section 241. That section prohibits a conspiracy to deprive a citizen of the United States of the free exercise or enjoyment of his constitutional rights. The provision has two statutory elements: (1) a conspiracy and (2) the specific intent to "injure, oppress, threaten or intimidate." *See United States v. Morado*, 454 F.2d 167, 169 (5th Cir.), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). In addition, the government also must establish an overt act in order to show a violation of section 241. *See United States v. McKenzie*, 768 F.2d 602, 605 (5th Cir.1985) (citing *United States v. Saenz*, 747 F.2d 930, 937 (5th Cir.1984)).

The defendants fail in their first contention. The government is correct in asserting that conspiring to deprive citizens of their civil rights in violation of section 241 is a crime of violence within the meaning of section 924(c), because it creates "a substantial risk" of violence. Two courts of appeals explicitly have decided that conspiring to commit a crime of violence creates a "substantial risk" of violence. *See United States v. Cruz*, 805 F.2d 1464, 1474 n. 11 (11th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987); *United States v. Chimurenga*, 760 F.2d 400, 403–04 (2d Cir.1985). Indeed, the court in *Cruz* held that "[t]he use of the terms 'may' and 'substantial risk' [in section 924(c)] ... emphasizes Congress' determination that violence need not be a necessary ingredient of the underlying predicate offense. Rather the statute requires merely that the predicate crime cre-

ate a substantial risk of the possible use of force." 805 F.2d at 1469.

▪ And as the government points out, an agreement to "injure, oppress, threaten, or intimidate" an individual creates a substantial risk of the possible use of force. The words "injure," "oppress," "threaten," and "intimidate" have definitions that assume that force can be used. The government also correctly demonstrates that the defendants are wrong in contending that a conspiracy cannot create a substantial risk of physical force, as the offense is complete upon reaching an agreement without the use of any force. Indeed, as the court said in *Chimurenga*, "a conspiracy to commit an act of violence is an act involving a 'substantial risk' of violence." 760 F.2d at 404 (citations omitted).

▪ The defendants also fail in their second contention. While they cite legislative history suggesting that section 924(c) should not apply where the firearm "play[s] no part in the crime," *see* S.Rep. No. 225, 98th Cong., 1st Sess. 314 n. 10 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10, they argue that since the elements of section 241 are only a conspiracy and specific intent, a firearm cannot be used "during and in relation to" the commission of that crime. The government, however, correctly demonstrates that the defendants used a firearm "during and in relation to" the conspiracy to deny citizens their civil rights, as required by section 924(c).

The government focuses upon the "in relation to" language of section 924(c). Such language, it insists, ensures that there is "some relation to or connection between the underlying criminal act and the use or possession of the firearm." *United States v. Stewart*, 779 F.2d 538, 540 (9th Cir.1985), *cert. denied*, 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987) (citing *United States v. Robertson*, 706 F.2d 253, 256 (8th Cir.1983)). The government maintains that "[s]ection 924(c)(1) reaches the possession of a firearm which in any manner facilitates the execution of a ... [crime of violence]." *United States v. LaGuardia*, 774 F.2d 317, 321 (8th Cir.

1985). Indeed, one court has held that a defendant convicted of conspiracy to distribute cocaine "used" a firearm within the meaning of the statute, despite the fact that the gun nearest to him was holstered and never brandished or displayed. *See United States v. Moore,* 580 F.2d 360, 362 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978).

In this case, there is a connection between the defendants' conspiracy to deny citizens their civil rights and the use of the firearm. Not only did at least one of the defendants use the gun during the vandalism, but it was also used actually to perpetrate such damage to the temple and community center. Thus, whether such activity can be defined as a conspiracy to "injure, oppress, threaten, or intimidate" these citizens in the use of their property, the use of the gun occurred "in relation" to and in commission of the crime.

### XIV.

The defendants contend that the court abused its discretion in upwardly departing from the sentencing guidelines. They specifically mention seven areas of such asserted abuse. In two of these areas, the defendants claim that the court made (1) an upward victim-related adjustment and (2) an upward departure as an adjustment for endangerment of public safety. All five defendants then claim that the court erred in making upward, or refusing downward, adjustments in their sentences.

 We disagree with defendants' contentions and affirm all seven of the sentencing decisions made by the court. As the government has suggested, many of the court's upward departures are, in fact, adjustments of defendants' base offense

levels pursuant to chapter three of the guidelines. Such base offense level adjustments were made instead of departing from the sentencing guidelines pursuant to U.S.S.G. ch. 5, pt. K. Indeed, the court did not err in adjusting the base offense levels for defendants' sentences, in refusing to make the downward departures requested by Wood and Greer, in upwardly departing from the guidelines, and in considering the crimes charged in counts one and two of the indictment as separate offenses for sentencing purposes.[30]

Finding no reversible error, we therefore AFFIRM the judgments of conviction and sentence as to each defendant.

---

**30.** It is necessary, however, to address the court's victim vulnerability adjustment under U.S.S.G. § 3A1.1. While we agree with the court, in this instance, that an upward adjustment was warranted because the victims were particularly vulnerable because of their racial and ethnic status, we caution against the overuse of this section for such purposes. The sentencing guidelines were not intended to provide harsher penalties for crimes committed against certain racial and ethnic groups, nor were they intended to penalize individuals of one race for crimes committed against members of different racial and ethnic groups. Rather, the section is available for the limited use by district courts for those specific situations in which the racial and ethnic characteristics of a victim or victims play a significant role in their being targeted by certain individuals for criminal activity. *See United States v. Salyer,* 893 F.2d 113, 115–16 (6th Cir.1989).