**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jonathan David BROWN,**
**Defendant–Appellant.**

No. 92–6546.

United States Court of Appeals,
Sixth Circuit.

Submitted Oct. 10, 1994.

Decided March 21, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied May 11, 1995.*

---

* Batchelder, Circuit Judge, would grant rehearing for the reasons stated in her dissent.

David K. Flynn, Leslie A. Simon, Thomas E. Chandler (briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section Washington, DC, for plaintiff-appellee U.S.

Jonathan David Brown, Springfield, MO (briefed), for defendant-appellant Jonathan David Brown.

Before MARTIN and BATCHELDER, Circuit Judges; ENSLEN, District Judge.**

MARTIN, J., delivered the opinion of the court, in which ENSLEN, D.J., joined. BATCHELDER, J. (pp. 1169–1178), delivered a separate dissenting opinion.

BOYCE F. MARTIN, Jr., Circuit Judge.

Jonathan David Brown appeals his jury conviction for one count of being an accessory after the fact to a conspiracy to violate civil rights, in violation of 18 U.S.C. §§ 3 and 241, and for two counts of making false declarations before a grand jury, in violation of 18 U.S.C. § 1623. On appeal, Brown argues that he could not be an accessory after the fact because there was no underlying offense against the United States. For essentially the same reason, he argues that his convictions for perjury cannot stand. Finally, he challenges the validity of a search that was executed at his home, but does so by claiming error in the district court's denial of his motion to return seized property. We disagree with Brown's contentions and affirm his conviction.

This case stems from the drive-by shooting of a synagogue in Nashville, Tennessee. On June 9, 1990, Damion Patton, a juvenile "skinhead" as described by the Nashville Police, and Leonard William Armstrong, the Grand Dragon of the Tennessee White Knights of the Ku Klux Klan, met Brown at a meeting of white supremacist groups which advocated the hatred of Jewish people. Early on the morning of June 10, around 1:00 a.m., Patton and Armstrong drove by the West End Synagogue in Nashville, which another "skinhead" had been accused of defacing a year earlier by spray-painting a swastika on it. As Patton drove by the synagogue, Armstrong fired several shots into the synagogue with a "Tech 9mm" assault pistol. Due to the early hour, no one was present in the synagogue or injured. However, a member of the synagogue described the effect of the shooting as shocking, intimidating, and perceived as life-threatening. Evidence at trial established that Brown assisted Patton in evading the authorities.

After the shooting, Patton returned to his apartment, where he was arrested later that morning as police broke up an all-night party and confiscated an "AKS-47" rifle. Patton was released the next day into Brown's custody and went to live at Brown's farm in Pleasantville. However, Brown told police that Patton would live at Brown's Nashville apartment as he was about to be evicted from his own. One week later, Brown went to the farm and told Patton that the FBI was looking for him. Brown purchased spray paint and helped Patton paint his car—the one used during the shooting—from white to black. He then provided Patton with a license plate from one of his trucks and cash to help Patton flee the state. Brown later wired additional funds to Patton in Las Vegas. Approximately five months after leaving, Patton returned to Brown's farm and stayed for a month. In September 1991, the FBI located Patton, who pled guilty to federal charges relating to the synagogue shooting.

As part of their ongoing investigation of the shooting, members of the Nashville Metro Police Department had spoken with Brown. On June 12, 1990, after Patton had been released into his custody, Brown told Sergeant Wynn that Patton was living with him until Patton returned to California to live with his father. Based on this information, a federal magistrate in Nashville issued a search warrant for Brown's apartment. Special Agent Dillender of the FBI prepared

** The Honorable Richard A. Enslen, United States District Judge for the Western District of Michigan, sitting by designation.

the affidavit for the search warrant. Dillender was assigned to investigate a number of criminal civil rights incidents in Nashville, including the West End Synagogue shooting. The warrant authorized a search of Brown's apartment for evidence or instrumentalities of these crimes; it was executed on June 15.

On June 19, Brown was subpoenaed to testify before a federal grand jury investigating the synagogue shooting. He testified that Patton lived with him for a few days after his arrest, sleeping on the floor, before going to California. He also testified that the last time he had spoken with Patton was the day before the FBI came to his apartment looking for Patton. One year later, Brown again appeared before a grand jury regarding the vandalism of religious property. Brown testified, truthfully this time, that after the first hearing, Patton did not go to California; instead, a few days later, Patton went to live and work at Brown's farm. Also, Brown testified that when he saw Patton again, Patton had spray painted his car.

Brown appeared before the grand jury a third time on December 10, 1991. The United States maintains that Brown was invited to attend by letter, which advised him that he was a possible defendant in the grand jury's investigation of a shooting into the West End Synagogue. He was advised of his rights in the letter, and again at the beginning of the hearing. He was also told that if he lied to the grand jury, he could be charged with perjury. Nevertheless, when specifically asked whether he painted Patton's car or provided Patton with a license plate, Brown responded that he had not.

On April 22, 1992, Brown was charged in a three-count indictment with perjury and as an accessory after the fact. Count I alleged that he violated 18 U.S.C. § 3 (1988) by attempting "to prevent the apprehension, trial and punishment" of Armstrong and Patton, when he knew they had committed an offense against the United States. That offense was identified as a conspiracy in violation of 18 U.S.C. § 241 "to injure, oppress, threaten and intimidate Jewish inhabitants and citizens of the United States in the free exercise and enjoyment of the right, secured to them by the Constitution and laws of the United States, to hold and use real and personal property in the same manner as that right is enjoyed by all citizens, by firing gunshots into the West End Synagogue." 18 U.S.C. § 241 (1988 & Supp. V 1993). The perjury allegations, Counts II and III, stemmed from Brown's testimony before the grand jury on December 10, 1991. On August 20, 1992, after an eight-day jury trial, Brown was convicted on all counts. He was sentenced on November 12 to imprisonment for two years and three months, three years' supervised release with special conditions, and was assessed a $10,000 fine. Brown filed a timely notice of appeal the same day.

Brown argues that his convictions should be reversed because the West End Synagogue is owned by a corporation and not by citizens. He reasons that because the synagogue property was not *held* by a *citizen,* there could be no violation of 42 U.S.C. § 1982 (1988), which enumerates the property rights of citizens. Thus, he asserts that Patton's and Armstrong's actions were not a crime under federal law to which he could be convicted as an accessory after the fact. As to Counts II and III, Brown argues that his perjury convictions cannot stand for the same reason, asserting that the United States fraudulently overreached the grand jury's purpose to generate and sustain an improper inquiry.

.I.

■ To establish a conspiracy to interfere with civil rights, the United States must prove that the defendant knowingly joined a conspiracy to injure, oppress, threaten or intimidate a victim with the intent to deprive him of a civil right and that an overt act was committed in furtherance of the conspiracy. 18 U.S.C. § 241 (1988 & Supp. V 1993); *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). The United States need not prove that the defendant actually knew it was a constitutional right being conspired against or violated. *United States v. O'Dell,* 462 F.2d 224, 232 n. 10 (6th Cir.1972). Because the victims in this case, the Jewish members of the West End Synagogue, do not own the synagogue, the central question in this case is whether their right to

"use" property free from racial discrimination is a protected civil right.

The underlying offense to which Brown is an accessory was a conspiracy between Patton and Armstrong to intimidate citizens of the Jewish faith in their right, pursuant to Section 1982, to hold and use real property for worship in the same manner as used by all citizens. Brown argues that the "use" of property is not protected by Section 1982, only the right to "hold" property. He further argues that a citizen must *own* property in order to be denied the right to *hold* property. This reading of the statute does not comport with the broad construction courts have traditionally given Section 1982. We agree instead with *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir.1991), *aff'd en banc*, 968 F.2d 433 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993), where the Fifth Circuit rejected an identical argument regarding the defacement and vandalism of a Jewish synagogue and community center in Texas. In reaching our decision in this case, we conclude that Section 1982 must be construed broadly to encompass the "use" of property.

■ Section 1982 protects the right of citizens to "hold" real and personal property. It states:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

Section 1982 was enacted to enable Congress to enforce the Thirteenth Amendment, specifically to "prohibit all racial discrimination, private and public, in the sale and rental of property." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968). In *Jones*, the court looked to the legislative history of Section 1982—the debates surrounding the Civil Rights Act of 1866—and explained that Section 1982 was intended to do more than destroy the discrimination embodied by the Black Codes: "It would affirmatively secure for all men, ... the 'great fundamental rights.'" *Id.* at 432, 88 S.Ct. at 2199 (quoting Cong.Globe, 39th Cong., 1st Sess., 475). Included among these "basic civil rights"

were the right to acquire property and the right "to go and come at pleasure." *Id.* In passing the Civil Rights Act of 1866, Congress assumed "that it was approving a comprehensive statute forbidding *all* racial discrimination affecting the basic civil rights enumerated in the Act." *Id.* at 435, 88 S.Ct. at 2201.

Although specifically aimed at "racial" discrimination, "definitions of race when § 1982 was passed were not the same as they are today." *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617, 107 S.Ct. 2019, 2022, 95 L.Ed.2d 594 (1987) (citing *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)). Section 1982 "was 'intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.'" *Id.* (quoting *Saint Francis*, 481 U.S. at 613, 107 S.Ct. at 2028). The question before the court was "not whether Jews are considered to be a separate race by today's standards, but whether, at the time § 1982 was adopted, Jews constituted a group of people that Congress intended to protect." *Id.* The court answered this question in the affirmative and found "that Jews ... were among the peoples then considered to be distinct races and hence within the protection of the statute." *Id.* at 617–18, 107 S.Ct. at 2022; *see also Jews for Jesus v. Jewish Comm. Rel. Council of N.Y.*, 968 F.2d 286, 291 (2d Cir.1992) (discussing *Shaare Tefila* and *Saint Francis*); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261 (7th Cir.1990) (noting that "historically the term ['race'] was used much more broadly, to denote groups having common ancestry or even a common culture," and in this "traditional loose sense," "Jews are members of a distinct race."); *cf. Bisciglia v. Kenosha Unified School Dist. No. 1*, 45 F.3d 223, 229–30 (7th Cir.1995) (holding that "Italians" may be considered an identifiable "race" for purposes of a claim of racial discrimination under Section 1981).

■ The legislative history therefore supports the proposition that a Jewish person's "use" of property is protected under Section 1982. Further support can be found

in *City of Memphis v. Greene,* 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981). There, the court similarly gave a broad construction to Section 1982, although ultimately it did not find that it had been violated. In *Greene,* the City of Memphis blocked the street to a black neighborhood for supposedly neutral reasons including traffic control. *Id.* at 104, 101 S.Ct. at 1588–89. Although the court found that the right to acquire and use property was not significantly impaired, it elaborated on the scope of Section 1982. "To effectuate the remedial purposes of the statute, the Court has broadly construed this language to protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire and *use* property on an equal basis with white citizens." *Id.* at 120, 101 S.Ct. at 1597 (emphasis added).

Relying on *Greene,* 451 U.S. at 120, 101 S.Ct. at 1596–97, and *Jones,* 392 U.S. at 421–22, 88 S.Ct. at 2193–94, the Fifth Circuit in *Greer* held that "the phrase 'to hold' property under the statute can also mean 'to use' property. In this way, the government is able to establish that members and nonmembers of the temple and community center, such as guests, could claim that the acts of defendants violated their right to use this property." *Greer,* 939 F.2d at 1091. Thus, the court concluded that the "use" of property is a protected civil right. We adopt its reasoning. Here, Jewish citizens were unquestionably denied their right to use property free from racial discrimination. Jewish citizens who were members of the synagogue testified that they were intimidated in their use of the synagogue.

██ *Greer* is not alone in finding that property rights other than ownership are protected by Section 1982. Members of the West End Synagogue may properly be considered to be guests or invitees when they attend the synagogue. The Second Circuit has held that guest status is an interest which Section 1982 may protect. In *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1337–38 (2d Cir.1974), a private swim club changed its rules for allowing guests, so that non-member black children would no longer be permitted at the pool. The Second Cir-

cuit found that "[w]hile the condition of being a guest is not normally considered a 'property' right one can 'hold,' *there is authority and justification for considering it such under [Section] 1982." Id.* at 1339 (emphasis added). Further, the court concluded that it was reasonable to characterize the freedom to go and come as guests as "sufficiently pertaining to a condition of property to be a right capable of being held under [Section] 1982." *Id.*

> Upon being invited by a member of the club, a black child becomes an invitee of that member with certain rights pursuant thereto. Whether these rights are denominated licenses, easements or usufructs, *the guest has an interest in his guest status which the law may protect from certain invasions.*

*Id.* (citation omitted) (emphasis added). If guest status at a private swim club is a protected interest under Section 1982, then certainly the right to "go and come at pleasure" to one's place of worship is as well.

██ "Our work would certainly be much easier if every case could be resolved by consulting a dictionary, but when Congress has legislated in general terms, judges may not invoke judicial modesty to avoid difficult questions." *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2629, 129 L.Ed.2d 687 (1994) (Stevens, J., concurring). We agree with *Greer* and *Olzman* that non-owners of property who nevertheless have an interest in using or holding that property have a viable property interest protected under Section 1982.

## II.

Brown next challenges his conviction for perjury. Section 1623 provides in pertinent part that "[w]hoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1623(a). Brown had testified before the grand jury twice before he gave the testimony on which the perjury counts are based. He appeared before the grand

jury on June 19, 1990, and on June 19, 1991. Three months after his second appearance, Patton and Brown's brother testified and contradicted Brown's earlier testimony. Brown concedes for purposes of his appeal that his statements before the grand jury on December 10, 1991, were false. Brown argues, however, that his perjury conviction is nonetheless invalid because no citizen held the West End Synagogue property. He claims the United States knew this fact, but maintained otherwise before the grand jury. Thus, Brown argues, the United States overreached the grand jury's purpose "to generate and sustain an improper inquiry" and any false declarations made were material only to that improper inquiry. Brown also asserts that the United States set a "perjury trap" by inviting him to testify before the grand jury again on December 10.

▮ Given our analysis of Section 1982, and our conclusion that Patton's and Armstrong's actions constituted a federal crime under 18 U.S.C. § 241, Brown's first argument is without merit. A federal grand jury has jurisdiction to investigate conduct that might have been a federal crime and that occurred within the jurisdiction of the federal court convening it. *United States v. McInnis*, 601 F.2d 1319, 1327 (5th Cir.1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980). Because the conduct being investigated *was* a federal crime, the grand jury's inquiry here was proper. Further, Brown's argument that the United States engaged in prosecutorial misconduct through a "perjury sting operation" is likewise unavailing.

When testimony is elicited before a grand jury that is "attempting to obtain useful information in furtherance of its investigation", *United States v. Devitt*, 499 F.2d 135, 140 (7th Cir.1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975), or "conducting a legitimate investigation into crimes which had in fact taken place within its jurisdiction", *United States v. Chevoor*, 526 F.2d 178, 185 (1st Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), the perjury trap doctrine is, by definition, inapplicable.

*United States v. Chen,* 933 F.2d 793, 797 (9th Cir.1991). Thus, we find Brown's challenge unpersuasive. The grand jury had jurisdiction to investigate Brown's conduct, and the United States did not set a "perjury trap."

### III.

▮ Finally, Brown argues that the June 15, 1990, search of his apartment violated his Fourth Amendment rights, although he states this by claiming error in the district court's denial of his motion to return the seized property. He asserts that because the search warrant focused on Patton and his activities, the executing officers conducted an impermissible general search by seizing Brown's personal property. He takes particular offense at the fact that his bedroom and closet were searched, and these are not areas where a "guest" might be expected to be found. Brown reads the warrant as authorizing a search only for Patton and his property, rather than for evidence of the crimes committed. However, this contention is without merit. The warrant application and affidavit make clear that its scope included evidence of specific crimes by Patton and others, on the premises then occupied by Patton. Moreover, a warrant may authorize searching property regardless of whether the owner of that property is implicated in the misconduct. *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1976–77, 56 L.Ed.2d 525 (1978).

On June 15, 1990, a federal magistrate in Nashville issued two search warrants in connection with this investigation: one authorizing a search of Brown's apartment, specifying the address as "902 Cedar Pointe Parkway," and the other authorizing a search of Damion Patton. Special Agent Dillender applied for both warrants and each application refers to her affidavit in describing the basis for probable cause and the items sought. Each warrant issued also refers to Dillender's affidavit as establishing probable cause. Special Agent Dillender and Sergeant Wynn were both present during the execution of these warrants.

▮ Although the dissent argues that these warrants are insufficient to meet the constitutional requirement of particularity,

such is not the case. The first search warrant provided for a search "on the premises" of Brown's apartment, and specified his address. The second warrant authorized a search of and for Damion Patton's person. On June 12, 1990, only three days prior to the warrants' issuance, Brown told Sergeant Wynn that Patton was living with him after being released from custody. The knowledge of the executing officers in this case is a factor which may cure any insufficiencies in the search warrant's description of the premises. *United States v. Williamson,* 1 F.3d 1134, 1136 (10th Cir.1993). Furthermore, "when one of the executing officers is the affiant who describes the property to the judge, and the judge finds probable cause to search the property as described by the affiant, and the search is confined to the areas which the affiant described, then the search, in this case, is in compliance with the fourth amendment." *United States v. Gahagan,* 865 F.2d 1490, 1499 (6th Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 590 (1989).

■ Brown also challenges the seizure of his personal property indicating membership in the Ku Klux Klan and other white supremacist groups. He argues that seizing such items requires executing the search with "scrupulous exactitude" because of First Amendment concerns. Still, Brown has not shown that the search and seizure was improper. The publications and papers set forth in the search warrant affidavit are limited to those concerning the identification of targets of skinhead and Klan activities. Furthermore, in stating why those items are relevant to the crimes charged, the affidavit is far more specific than other warrants struck down on this ground. *See Stanford v. Texas,* 379 U.S. 476, 482, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965) (holding that warrant authorizing search of private home for *all* books, records, and other materials relating to the Communist party was too broad); *United States v. Apker,* 705 F.2d 293 (8th Cir.1983) (striking down warrants that sought only indicia of Hell's Angels member-

ship), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). When considered in light of his relationship to Patton and Armstrong, Brown's seized personal property implicated him in the crimes being investigated. Moreover, even evidence "not described in a search warrant may be seized if it is 'reasonably related to the offense which formed the basis for the search warrant.'" *United States v. Fortenberry,* 860 F.2d 628, 636 (5th Cir.1988) (quoting *United States v. Munroe,* 421 F.2d 644, 646 (5th Cir.), *cert. denied,* 400 U.S. 851, 91 S.Ct. 79, 27 L.Ed.2d 89 (1970)); *see also United States v. Korman,* 614 F.2d 541, 547 (6th Cir.) (stating that evidence or instrumentalities of crime may be seized even though not specifically listed in the search warrant), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980).

Therefore, for the foregoing reasons, Brown's conviction is AFFIRMED on all three counts.

BATCHELDER, Circuit Judge, dissenting.

The activity to which this defendant was convicted of being an accessory is so offensive that it would be much more agreeable to concur in the majority's opinion. It is disheartening that as we mark the fiftieth anniversary of the liberating of the Nazi death camps, we are still combatting anti-semitism here at home. But I must dissent because I believe the majority is simply wrong, both in its analysis of the 42 U.S.C. § 1982 issue and in its treatment of the Fourth Amendment claim.

**I.**

Count I of the indictment in this case charges defendant Brown as an accessory after the fact for assisting Damion Patton in evading capture in connection with a crime against the United States. The Government contends that the synagogue shooting was a conspiracy between Patton and Leonard Armstrong, in violation of 18 U.S.C. § 241,[1]

---

1. If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State ... in the free exercise or enjoy-

ment of any right or privilege secured to him by the Constitution or laws of the United

to intimidate Jewish citizens [2] in the exercise of their rights to hold and use property in the same manner as enjoyed by all citizens, in violation of 42 U.S.C. § 1982.[3] The Government states that "as a result of the shooting the rights of Jewish citizens to use the facility were impaired."

Defendant Brown points out that the West End Synagogue is owned by a corporation and not by Jewish citizens. Therefore, Brown contends that the synagogue shooting did not deny any Jewish "citizens" their right to "hold" property, because neither private nor public corporations are citizens within the meaning of the Fourteenth Amendment. *See South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500, 503–04 (6th Cir.1986). The debate on this issue centers on whether, by explicitly protecting a citizen's right to hold property, § 1982 also implicitly protects a citizen's right to *use* property in which he has no ownership or lesser possessory interest.

The majority relies on the only circuit court decision to have reached the conclusion that § 1982 protects a citizen's right merely to *use* property, *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir.1991). *Greer* involved facts remarkably similar to the present case: Members of a skinhead group were charged, in part, with violating 18 U.S.C. § 241 by defacing and vandalizing a Jewish temple that was owned by a non-profit corporation. The defendants argued that the evidence did not prove they violated the prohibition of 42 U.S.C. § 1982 on depriving citizens of their right to hold property because a corporation was not a citizen. *Greer*, 939 F.2d at 1091. The Fifth Circuit rejected this

States, or because of his having so exercised the same;

. . . .

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both;. . . .

18 U.S.C.A. § 241 (West Supp.1994). This statute has subsequently been amended in a manner that does not affect this opinion.

**2.** The Supreme Court extended § 1982 to Jewish people in *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18, 107 S.Ct. 2019, 2021–22, 95 L.Ed.2d 594 (1987).

**3.** All citizens of the United States shall have the same right, in every State and Territory, as

assertion and, citing to *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), and *City of Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981), as authority for the proposition, held that "the phrase 'to hold' property under the statute can also mean 'to use' property. In this way, the government is able to establish that members and non-members of the temple . . . could claim that the acts of defendants violated their right to use this property." *Greer*, 939 F.2d at 1091 (citations omitted).

However, *Jones* and *Greene* do not support the Fifth Circuit's position. *Jones* held that § 1982 extends to private as well as governmental acts of discrimination in the sale or rental of property and that the authority of Congress to enforce the Thirteenth Amendment includes the power to eliminate all racial barriers to the acquisition of real and personal property. Certainly the Court discussed at length the legislative history of § 1982, referring specifically to the remarks of Senator Trumbull that the bill [4] would secure for all citizens the " 'great fundamental rights,' " which consisted of " 'the right to acquire property, the right to go and come at pleasure, the right to enforce rights in the courts, to make contracts, and to inherit and dispose of property.' " *Jones*, 392 U.S. at 432, 88 S.Ct. at 2199 (quoting Cong. Globe, 39th Cong., 1st Sess. 475 (1866) (statement of Sen. Trumbull)). However, nothing in that discussion or any other discussion in *Jones* permits its citation for the proposition that " 'to hold' property under [§ 1982] can also mean 'to use' property." [5] *Greer*, 939 F.2d at 1091.

is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C.A. § 1982 (West 1994).

**4.** Senator Trumbull was speaking in regard to the Senate version of the Civil Rights Act of 1866, which included what is now § 1982.

**5.** In fact, the *Jones* Court began its analysis with an "important" clarification of the precise scope of § 1982. *Jones*, 392 U.S. at 413, 88 S.Ct. at 2189. According to the Court, § 1982, "[i]n sharp contrast" to the Civil Rights Act of 1968, was not a comprehensive anti-discrimination law. *Id.* "[Section 1982] does not deal specifi-

In *City of Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981), the Supreme Court held that the city's closing of part of a street leading from a white section of the city to a predominantly black section did not violate § 1982. There, the Court said,

> To effectuate the remedial purposes of the statute, the Court has broadly construed [§ 1982] to protect not merely the enforceability of property interests acquired by black citizens but also their right to *acquire and use* property on an equal basis with white citizens.

*Id.* at 120, 101 S.Ct. at 1597 (emphasis added). After discussing the line of cases that demonstrated this broad construction of § 1982's language, the Court held:

> Therefore, as applied to this case, the threshold inquiry under § 1982 must focus on the relationship between the street closing and the *property interests* of the respondents.... [T]he statute would support a challenge to municipal action benefiting white property *owners* that would be refused to similarly situated black property *owners*. For official action of that kind would prevent blacks from exercising the same property rights as whites.... Alternatively, ... the statute might be violated by official action that depreciated the value of property *owned* by black citizens.... Finally, the statute might be violated if the street closing severely restricted access to black homes, because blacks would then be hampered in the use of *their property*. ...
>
> ... [the street closing] does not involve any impairment to the kind of property interests that we have identified as being within the reach of § 1982.

*Id.* at 123–24, 101 S.Ct. at 1598 (emphasis added).

The language of § 1982 does not include among the rights it protects the right to "use" and "enjoy" property or the right to "go and come at pleasure." But this is the full extent of the right which the Government claims this defendant was an accessory to abridging. Although both *Jones* and *Greene* refer to the "broad" construction of § 1982, they do so in the context of a citizen's discernible property right. *Jones* stands for the proposition that private as well as governmental conduct is subject to the mandates of § 1982; *Greene* states that the right to acquire and use property is protected by § 1982. However, neither supports the proposition set forth in *Greer* that the phrase "to hold" can also mean "to use."

Furthermore, the case at hand is distinguishable from the cases holding that when an organization links membership benefits to residency, those benefits become part of the bundle of rights acquired through residency and that § 1982 guarantees all citizens the right to purchase the same bundle. *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 437, 93 S.Ct. 1090, 1093–94, 35 L.Ed.2d 403 (1973); *see Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236–37, 90 S.Ct. 400, 404–05, 24 L.Ed.2d 386 (1969); *Wright v. Salisbury Club, Ltd.*, 632 F.2d 309, 316 (4th Cir.1980). In *Tillman*, for example, the by-laws of an all-white community swimming pool club granted people living within a geographic preference area the right to join without an endorsement from a current member. *Tillman*, 410 U.S. at 431–32, 93 S.Ct. at 1091. The *Tillman* court held that

> [w]hen an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area. The mandate of 42 U.S.C. § 1982 then operates to guarantee a non-white resident, who purchases, leases, or

---

cally with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling. It does not prohibit advertising or other representations that indicate discriminatory preferences. It does not refer explicitly to discrimination in financing arrangements or in the provision of brokerage services. It does not empower a federal administrative agency to assist aggrieved parties. It makes no

provision for intervention by the Attorney General. And, although it can be enforced by injunction, it contains no provision expressly authorizing a federal court to order the payment of damages." *Id.* at 413–14, 88 S.Ct. at 2189–90 (footnotes omitted). Thus, such an extension of § 1982 would require "congressional action." *Id.* at 415, 88 S.Ct. at 2190.

holds this property, the same rights as are enjoyed by a white resident.

*Id.* at 437, 93 S.Ct. at 1094. These cases support Brown's assertion that, before a person is entitled to § 1982 protection for "use" of the property, he must "hold" the property through some form of acquisition.[6]

Two additional cases cited by the Government deserve comment. In *Walker v. Pointer,* 304 F.Supp. 56 (N.D.Tex.1969), a district court held that § 1982 protected white apartment tenants from eviction for having black guests because the § 1982 right "to hold" property included the freedom of blacks to go and come at the invitation of persons lawfully in control of the apartment. *Id.* at 61–62. Recognizing that "freedom to 'go and come at pleasure' is not to be asserted as a right under section 1982 regardless of the circumstances," *id.* at 62, that court nonetheless held that *Jones* stood for that very proposition. *Id.*

In *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir.1974), a case on which the majority here relies, the Second Circuit first acknowledged that "the condition of being a guest is not normally considered a 'property' right one can 'hold,'" and then, citing *Jones,* held precisely that. *Id.* at 1339.

> Upon being invited by a member of the club, a black child becomes an invitee of that member with certain rights pursuant thereto. Whether these rights are denominated licenses, easements or usufructs, the guest has an interest in his guest status which the law may protect from certain invasions.

*Id.* (citations omitted).

Both the *Walker* and *Olzman* courts seized on the phrase "to go and come at pleasure"

from the discussion in *Jones* of § 1982's legislative history to justify expanding the reach of § 1982 beyond its guarantee of the rights to "inherit, purchase, lease, sell, hold, and convey real and personal property." Because *Greer* relied on *Walker, Greer* implicitly hinged on this language as well. But nothing in *Jones* justifies this result.[7]

Finally, the majority includes a discussion of *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987), and cases following it, and concludes that "[t]he legislative history therefore supports the proposition that a Jewish person's 'use' of property is protected under Section 1982." But *Shaare Tefila* held only that Jews could state a claim of racial discrimination under § 1982. *Id.* at 617–18, 107 S.Ct. at 2022. Although the facts in that case were very similar to those in the case before us and the petitioners in *Shaare Tefila* had brought an action under § 1982, the district court had not reached the merits of the case but had dismissed the complaint on the grounds that Jews were not among those Congress intended for § 1982 to protect. The issue of whether § 1982 protects the right to "use" property was therefore neither before the Supreme Court nor addressed by it.

In my view, *Greer* represents an overextension of Supreme Court precedent and should not be followed by this Circuit. I would hold that § 1982 does not extend to a person who merely uses but does not hold property. Furthermore, I note that Congress specifically criminalized the kind of behavior at issue in this case under 18 U.S.C.

---

6. Furthermore, even when a person holds property, its damage or destruction might not create a § 1982 claim. In *Stackhouse v. DeSitter,* 620 F.Supp. 208 (N.D.Ill.1985), a white person fire-bombed a black person's car, but the district court refused to find this act a violation of § 1982. *Id.* at 209–10.

7. The Civil Rights Act of 1866 also gave all citizens the right "to make and enforce contracts," which became 42 U.S.C. § 1981. Before being overruled by the Civil Rights Act of 1991, the Supreme Court construed § 1981 as not

reaching conduct that occurs after the making or enforcing of a contract: "The right to enforce contracts does not, however, extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Patterson v. McLean Credit Union,* 491 U.S. 164, 177–79, 109 S.Ct. 2363, 2372–74, 105 L.Ed.2d 132 (1989). Logically, if § 1981 does not extend past the making or enforcing of a contract, then § 1982 should not extend beyond the acts of inheriting, purchasing, leasing, selling, holding, or conveying property.

§ 247.[8] While I am entirely in sympathy with the Government's desire to prosecute the kind of loathsome activity committed by Patton and Armstrong, to which this defendant was an accessory, I believe that it is properly the function of Congress to provide the means to do so, either by amending § 1982 to include among its protections the use of property by those who hold no property right in it, or by amending 18 U.S.C. § 247 to cover such activity resulting in damage in lesser dollar amounts. I would reverse Brown's conviction on Count I.

## II.

The majority disposes of defendant Brown's Fourth Amendment claim by concluding that even if the search warrant did not expressly list some of the items seized, these items were reasonably related to the underlying offense and, therefore, the officers could seize them. The majority, however, fails to address the real issue, namely, that the two warrants used in the search of Brown's apartment are invalid.

As a preliminary matter, the majority notes that Brown unconventionally raises this claim by a motion to return property, instead of a motion to suppress evidence. First of all, Rule 41(e) explicitly provides for the filing of a motion for return of property by a person aggrieved by an unlawful search and seizure, and provides that when such a motion is filed after an indictment, it "shall be treated also as a motion to suppress under Rule 12." Fed.R.Crim.P. 41(e). Second, Brown is a pro se appellant and we are obliged to construe his pleadings liberally. *Myers v. United States*, 636 F.2d 166, 168 (6th Cir.1981). Brown's pre-trial "Motion to Return Property" was filed for exactly the same purpose as would be a motion to suppress evidence—Brown believed the Government had seized his property in violation of the Constitution and he wanted his property returned so that the Government could not use it against him at trial. Brown's motion is entirely proper.

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has stated that "a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977); *see National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 667, 109 S.Ct. 1384, 1391–92, 103 L.Ed.2d 685 (1989).

A warrant constitutes a limitation on the right of the government to search and to seize an individual's property. The courts do not, however, require nit-picking adherence to technicalities in determining whether the search and seizure authorized by a warrant are sufficiently defined to make the warrant valid. "We are concerned with realities of administration of criminal justice. It is sufficient if the warrant signed by the judicial officer is particular enough if read 'with reasonable effort' by the officer executing the warrant." *Moore v. United States*, 461 F.2d 1236, 1238 (D.C.Cir.1972).

There are two aspects to the particularity requirement. First, the warrant must provide a particular description of the places to be searched and the things to be seized. *Marron v. United States*, 275 U.S. 192, 195–96, 48 S.Ct. 74, 75–76, 72 L.Ed. 231 (1927). Second, the warrant should provide a sufficiently detailed explanation of the suspected criminal activity that occasions the search to enable the executing officers to limit their search to evidence relating to that criminal activity and to inform the subjected individual what property the officers are entitled to

---

**8.** 18 U.S.C.A. § 247 (West Supp.1995) punishes a person who "intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so" if the damage exceeds $10,000, or who "intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so...." In 1994, Congress amended this statute to enhance the punishment for violations that included the "use, attempted use, or threatened use of a dangerous weapon...." *Id.*

take. *Rickert v. Sweeney,* 813 F.2d 907, 909 (8th Cir.1987). Inclusion of a statutory reference can provide the necessary particularity if the statute itself is sufficiently narrow to limit the scope of the search. *Id.* at 909. However, where the only limitation on the search and seizure is provided by the reference in the warrant to several statutes, some of which are very broad in scope, courts have held that the warrant contains no limitation at all. *United States v. Spilotro,* 800 F.2d 959, 965 (9th Cir.1986); *United States v. Roche,* 614 F.2d 6, 8 (1st Cir.1980).

Inadequacy of the warrant in one of these respects may be compensated for by specificity and completeness in the other, but to be valid, the warrant must contain the information necessary to properly limit the search and seizure. *Spilotro,* 800 F.2d at 964 ("[T]he government could have narrowed most of the descriptions in the warrants either by describing in greater detail the items one commonly expects to find on premises used for the criminal activities in question, or, at the very least, by describing the criminal activities themselves rather than simply referring to the statute believed to have been violated."). Therefore, a warrant is facially invalid if it neither particularly describes the places to be searched and the things to be seized nor adequately describes the suspected criminal conduct to which the search is related.

This Circuit has adopted the express incorporation rule for cases in which the warrant does not, on its face, meet the Fourth Amendment's particularity requirements. *United States v. Blakeney,* 942 F.2d 1001 (6th Cir.1991), *cert. denied,* 502 U.S. 1035, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992). Although a "fundamental distinction" exists between a warrant and its underlying affidavit, *Moore,* 461 F.2d at 1238, a court may construe a warrant with reference to its affidavit for purposes of the particularity requirement if the magistrate manifested an explicit intention to incorporate the affidavit. *Id.*

In *Blakeney,* we followed the D.C. Circuit's holding in *United States v. Maxwell,* 920 F.2d 1028 (D.C.Cir.1990). According to *Maxwell,* an affidavit can fulfill the particularity requirement for a facially void warrant only if " ' "(1) the affidavit accompanies the warrant, and in addition (2) the warrant uses 'suitable words of reference' which incorporate the affidavit by reference." ' " *Id.* at 1031 (quoting *United States v. Vaughn,* 830 F.2d 1185, 1186 (D.C.Cir.1987) (citations omitted)). In *Blakeney,* this Court held that the express incorporation requirements of *Maxwell* were met by a warrant that expressly incorporated one affidavit, and that affidavit expressly incorporated a second affidavit which contained the required particularity, and both affidavits were attached to the warrant. *Blakeney,* 942 F.2d at 1024.

Although the warrant in *Maxwell* contained no description of either the place to be searched or the specific things to be seized, the warrant did expressly incorporate a description of the premises and a description of the categories of items to be seized. *Maxwell,* 920 F.2d at 1031. Both of these descriptions were attached to the application for the search warrant and the application was attached to the warrant itself. *Id.* at 1031 & n. 1. However, there was no language in the warrant expressly incorporating an affidavit that provided details of the wire fraud scheme the appellant was suspected of perpetrating. *Id.* at 1032. The court found that without this affidavit, the warrant was fatally overbroad. *Id.* at 1033. Because the incorporated description of items to be seized listed only categories of items rather than specific items, those categories were limited only by the description's statement that they were all evidence of wire fraud in violation of 18 U.S.C. § 1343, and the court found that this reference to a broad federal statute constituted "no limitation at all." *Id.*[9]

I am aware that this court in *United States v. Gahagan,* 865 F.2d 1490 (6th Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 590 (1989), did find valid a search

---

9. The *Maxwell* court held that under the particular circumstances of that case, even though the warrant was constitutionally deficient, the evidence would not be suppressed because the affidavit supplying the particulars of the suspected criminal activity was attached to—although not explicitly incorporated into—the warrant, and the agent who had supplied that affidavit oversaw the execution of the warrant. *Maxwell,* 920 F.2d at 1034.

pursuant to a warrant that inadequately described the premises to be searched, even though the affidavit that more adequately described the premises was neither attached nor expressly referred to in the warrant. However, that case is clearly limited to curing warrants that erroneously describe a place to be searched when the affidavit is readily available to the executing officers and the affiant participates in the actual search. *Id.* at 1497, 1499. The warrant in *Gahagan* described a particular premise to be searched as "7609 Douglas Lake Road," whereas the affidavit also noted that "located on the property is a single story wood frame log cabin-type structure." *Id.* at 1492. The log cabin, as it turned out, was a separate residence with its own address of 7577 Douglas Lake Road. *Id.* at 1493. The *Gahagan* court upheld the search after noting that the affiant participated in the search and that courts have upheld searches when the warrant listed an incorrect address (often due to a typographical error) and the affiant was on the scene and pointed out the correct house. *Id.* at 1497–98. *Gahagan* stretches the express incorporation rule, but it does so only when, although the warrant incorrectly describes the place to be searched, the affidavit particularly describes the place and the affiant participates in the search.

The facts in the case before us are not like those in *Gahagan.* Nor is this case analogous to *Blakeney* or *Maxwell.* Although Special Agent Dillender was the affiant and was one of the agents who participated in the search, this was not a case in which the description in the warrant was simply erroneous. Here, the second warrant, which the Government contends authorized a search of Brown's apartment at 902 Cedar Pointe Parkway for Damion Patton, did not include any description of any location. Instead, the warrant was captioned "In the Matter of the Search of Damion Patton," and stated that affidavits were made to the magistrate by Special Agent Deborah Dillender, who "has reason to believe that on the person of Dam-

ion Patton ... there is now concealed a certain person or property, namely Damion Patton." The first warrant, while correctly describing the place to be searched, was entirely blank as to the things to be seized.

Neither warrant incorporated any affidavit, or contained any reference to an affidavit except for some preprinted language to the effect that "affidavit(s)" which established probable cause were made to the magistrate—the same preprinted boilerplate that the *Maxwell* court specifically held to be insufficient to incorporate an affidavit into the warrant. *Maxwell,* 920 F.2d at 1032. Incorporation requires "'suitable words of reference' evidencing the magistrate's explicit intention to incorporate the affidavit." *Id.* While the applications for the warrants contained the phrase "see attached affidavit," we do not know whether those applications were attached to the warrants. Even assuming the applications were attached, however, it is obvious from the record that no affidavits were attached to the applications. In short, it is clear that not only were there no affidavits incorporated into or attached to the warrants, there were no affidavits available to the agents or the defendant at the scene of the search, and, in fact, as is more fully discussed below, the only affidavit was under seal.

Neither warrant contained any indication of the criminal activity in which the defendant was suspected of being involved. Indeed, neither warrant even contained any reference to any criminal statutes.[10] The applications for the warrants, however, contained a reference to five separate sections of Title 18 of the United States Code. One of these sections, 18 U.S.C. § 371, prohibits conspiracies to commit *any offense against the United States;* another section, § 241, prohibits conspiracies to violate the civil rights of any individual. It is difficult to imagine any broader statutes. These statutory references in the applications for warrants, even if the applications were attached to the warrants, provide no limitations on the

**10.** It is true that the 1972 amendments to Fed. R.Crim.P. 41 removed the requirement that the warrant itself state the grounds for the warrant's issuance because it was "unnecessary paper work." Fed.R.Crim.P. 41 1972 advisory committee's note. However, the committee expressly noted that "[a] person who wishes to challenge the validity of a search warrant has access to the affidavits upon which the warrant was issued." *Id.*

search whatsoever. *See Spilotro,* 800 F.2d at 959.

One of the reasons for a strict attachment requirement, and for a warrant requirement in general, is that a citizen has a right to know why the police are invading his home and his privacy. In *Moore v. United States,* the D.C. Circuit stated,

> The requirement that the affidavit be attached to or inserted in the warrant is not a mere formality. It makes the affidavit of probable cause immediately available to the person whose premises are entered, and explains to him at the outset the reason for this intrusion on his privacy. And it avoids any possible claim or suspicion by the citizen involved that the affidavit later located in the official file was inserted after the fact of the search.

*Moore,* 461 F.2d at 1239.[11] In the case before us, Brown received no explanation when his apartment was searched regarding either probable cause for the search or the limitations on the search.

The Government disingenuously avoids addressing this issue by simply arguing that the supporting affidavit was sufficient. The majority opinion decides the issue as the Government has framed it, asserting that evidence not described in a warrant may be seized if "reasonably related" to the warrant's underlying offense. The cases cited by the majority certainly do stand for this proposition. However, those cases involve searches under valid warrants. In *United States v. Fortenberry,* 860 F.2d 628 (5th Cir. 1988), the police were searching pursuant to a valid warrant and "came across" reasonably related evidence. *Id.* at 636. In *United States v. Korman,* 614 F.2d 541 (6th Cir.), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980), the police were searching pursuant to a "lawfully executed search warrant" and seized "an instrumentality of a crime" in the form of a ski jacket, which was in plain view but listed only in the affidavit. *Id.* at 547. In the case before us, the police were not searching pursuant to a valid war-

rant. The type of evidence seized and its relationship to the underlying crime are simply not relevant here.

Had the affidavit accompanied or been attached to the warrants in this case, perhaps this court could incorporate that affidavit into the warrants using the rationale of *Maxwell.* The warrants then would have been sufficient to satisfy the requirements of the Fourth Amendment. But the affidavit was not with the warrants. This fact, although never mentioned by either the Government or the majority opinion, is inescapable from the record. First, the warrants contained in the Joint Appendix do not have any affidavits attached. Second, it is apparent from the trial court docket that the affidavit supporting the issuance of these warrants was *sealed.* The docket demonstrates that Brown moved to have that affidavit unsealed: "(37) 1–9–92 BROWN—MOTION by Deft to Unseal Search Warrant Documents in # 90–3155 and # 90–3157 relating to this Case" (these case numbers are the warrant numbers). That motion was denied. Third, Brown's first Motion to Return Property states that the affidavit was not attached, and his affidavit filed with that motion describes the events of the search and states that Special Agent Dillender handed him the two search warrants, but the affidavit "had been ripped off." Finally, the Government's response to that motion, dated January 24, 1992, indicates that Brown had not seen the affidavit as of that date:

> In June, 1990, a search warrant was lawfully issued by a federal magistrate in Nashville based on an affidavit prepared and signed by Special Agent Deborah Dillender of the Federal Bureau of Investigation. The affidavit *is attached* and *is being provided to defendant Brown.*

(Emphasis added).

These warrants are so facially deficient that the evidence seized should have been suppressed. In *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82

---

11. While the court in *Moore* did hold that the express incorporation requirement had been satisfied despite the lack of express words of incorporation in the warrant, the case involved a warrant that had been issued pursuant to a

Washington, D.C. statute requiring judges to attach all supporting affidavits to the warrant. *Moore,* 461 F.2d at 1239. Furthermore, it was undisputed that the affidavits were in fact attached to the warrant in that case. *Id.*

L.Ed.2d 677 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule does not apply when an officer acted "in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* at 922, 104 S.Ct. at 3420. The *Leon* Court, however, set forth four exceptions to the objectively reasonable standard, one of which is that "depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923, 104 S.Ct. at 3421. In my view, the officers who executed this warrant, including Special Agent Dillender, upon whose affidavit the warrant issued, could not reasonably have believed that these virtually blank warrants were valid.

The Fourth Amendment's particularity requirement protects the individual from a "general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). Furthermore, "[a] warrant must not leave it to the discretion of the executing officers what is, or is not, to be seized." *White Fabricating Co. v. United States*, 903 F.2d 404, 410 (6th Cir. 1990). Finally, the warrant "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Chadwick*, 433 U.S. at 9, 97 S.Ct. at 2482. It is unfortunately clear that some courts appear to have lost sight of these fundamental principles and appear to be willing to fudge considerably on their own pronouncements on the particularity requirements for search warrants.[12] But that is no reason for this court to do so. It is precious little protection to an individual to have police officers arrive with a warrant that contains neither any explanation of the reason for the search, nor any particularized description of places to be searched and things to be seized, nor any reference to an affidavit containing such particularity, nor any affidavit itself. It is not a demonstration of adherence to technicalities to conclude that warrants such as the ones in this case authorized a general search. In theory, at least, general searches are still unconstitutional. I therefore dissent from Part III of the majority opinion.

### III.

Finally, I concur with the majority's conclusion, although on different reasoning, that Brown's perjury convictions should be affirmed. A federal grand jury has jurisdiction to investigate "conduct that might have been a federal crime" that occurs within the territory of the federal court which convenes it. *United States v. McInnis*, 601 F.2d 1319, 1327–28 (5th Cir.1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980)). A person who testifies falsely before that grand jury properly may be charged with perjury, even if the grand jury is investigating acts that ultimately are not found to be federal crimes. *Id.* Furthermore, neither the government's anticipation that a witness might commit perjury nor its subsequent offer to plea bargain the perjury charge alters the fact that perjury was committed. *United States v. Chen*, 933 F.2d 793, 797–98 (9th Cir.1991).

The Government did not set a "perjury trap" for Brown, and the grand jury had jurisdiction to investigate Brown's conduct, which might have constituted a federal crime. Brown had a duty to tell the truth under oath. Instead he lied. Brown's assignment

---

12. For example, the D.C. Circuit has retreated somewhat from the rules laid down in *Maxwell*. In *United States v. Dale*, 991 F.2d 819 (D.C.Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993), the court held that the warrant, which undeniably incorporated the affidavit, was sufficient to satisfy the requirements of the Fourth Amendment even though it was not entirely clear from the record that the affidavit was present at the search. *Id.* at 846–48. The court pointed out that the warrant and its attachments listed a variety of documents to be seized, that the documents were "believed to contain specific information regarding the false statements and claims made by [defendant]," and that this was a criminal tax case where specificity is more difficult because "evidence of the crimes can be found in almost every type of business document conceivable." *Id.* at 847–48.

of error relative to his perjury convictions is without merit.